**CORBETTA CONSTRUCTION CO., Inc.**

v.

**The UNITED STATES.**

No. 369–65.

United States Court of Claims.

March 14, 1969.

---

Frank H. Connelly, New Rochelle, N. Y., attorney of record, for plaintiff. McGovern, Vincent & Connelly, New Rochelle, N. Y., of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to the trial commissioner* with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on March 18, 1968. Plaintiff excepted to the commissioner's "Ultimate Finding" and to that portion of the recommended conclusion of law providing that plaintiff is not entitled to recover on its first claim and for its dismissal. Defendant requested that the court adopt the commissioner's recommended opinion

---

* The memorandum opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a), and were prepared in the first instance by Judge Herbert N. Maletz of the United States Customs Court who was formerly a commissioner of this court, in which capacity he presided at the trial. The Chief Commissioner has reviewed the memorandum opinion, findings of fact and recommended conclusion of law prepared by Judge Maletz and is in agreement therewith. The same is adopted by him without modification and is filed under his name, pursuant to stipulation of the parties as to procedure.

and factual findings. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. See Seeds v. United States, 92 Ct.Cl. 97 (1940), cert. denied, 312 U.S. 697, 61 S.Ct. 731, 85 L.Ed. 1131 (1941); Cannon Construction Co. v. United States, 319 F. 2d 173, 162 Ct.Cl. 94 (1963); Brock & Blevins Co., Inc. v. United States, 343 F. 2d 951, 170 Ct.Cl. 52 (1965); Columbus Jack Corp. v. United States, 170 Ct.Cl. 902 (1965) (order). Therefore, plaintiff is not entitled to recover on its first claim which is dismissed. Plaintiff's second claim is remanded to the trial commissioner for trial on the merits.

## OPINION OF COMMISSIONER

BENNETT, Chief Commissioner:

In 1953, plaintiff entered into a contract with the Navy to construct a dry dock at the Brooklyn, New York, Naval Shipyard. In July 1955, plaintiff notified the Navy that it had encountered changed conditions during the course of construction for which it requested an equitable adjustment and time extension. On April 5, 1957, Change Order L and an accompanying letter agreement were signed allowing plaintiff an equitable adjustment of $2,600,000 for the changed conditions.

Subsequently, plaintiff filed suit here, its petition consisting of three separate claims. In its first claim, it seeks damages of $1,500,000 for delays allegedly caused by the changed conditions that were the subject matter of the April 5, 1957, equitable adjustment. In its second claim, it seeks damages of $1,000,000 for what is alleged (in part) to be unreasonable delay by the Navy in 1958 and 1959 in furnishing it necessary drawings and giving it notices to proceed.[1]

Defendant moved for summary judgment on plaintiff's first and second claims on the ground that Change Order L and the accompanying letter agreement constituted an accord and satisfaction which assertedly discharged completely plaintiff's claim for damages. Plaintiff in turn filed a cross-motion for partial summary judgment on the first claim. On March 24, 1967, the court denied defendant's motion and plaintiff's cross-motion for partial summary judgment without prejudice and ordered that "the case * * * [be] remanded to the trial commissioner for trial on the issue of the parties' intentions with respect to the scope of Change Order 'L', dated April 5, 1957, and the scope of the settlement agreement embodied in the accompanying letter of the same date."

The facts, as established at trial, are set out in detail in the accompanying findings. As to the first claim of the petition, the record establishes that the parties intended by Change Order L and the accompanying letter agreement to settle any and all claims for additional costs, including delay costs arising out of the changed conditions. The record further establishes that the parties did not intend that Change Order L and the accompanying letter constitute a settlement of the second claim of the petition —and defendant so concedes.

It is concluded that plaintiff's first claim should be dismissed and that the second claim should be remanded to the trial commissioner for a trial on the merits.

## FINDINGS OF FACT

1. On August 4, 1953, plaintiff entered into a lump-sum, fixed-price contract with the Department of the Navy, Bureau of Yards and Docks (hereafter referred to as the Bureau), in the amount of $8,662,000. The general nature of the work required to be performed was the construction of the Brooklyn, New York, Navy Yard, of a reinforced concrete dry

---

1. The third claim in the petition seeks review of an ASBCA decision in respect to other work under the contract. This claim is not involved in the present proceeding.

dock approximately 770 feet in length by 116 feet in width by 41 feet in depth upon the site of an existing timber dry dock (Dry Dock No. 3) of smaller dimensions.

2. Under the terms of the contract the plaintiff was required, among other things, to demolish the existing dry dock, to excavate large quantities of earth for the installation and construction of the new and enlarged dry dock, to erect a cofferdam of steel sheeting around the perimeter of the excavation, and to shore and brace the excavation during the course of construction in the manner shown by plans and specifications prepared by the defendant and forming part of the contract.

3. The contract contained the standard form Changed Conditions, Changes and Extras, and Disputes clauses. It did not contain a Suspension-of-Work clause.

4. Upon execution of the contract, plaintiff commenced performance which was to be completed by July 25, 1955. The contract was amended and modified by Change Orders A through C–C which, among other things, extended the time for completion. On February 3, 1960, the Navy accepted plaintiff's work as completed.

5. (a) After commencing construction, plaintiff, on July 21, 1955, wrote to the officer in charge of construction (OICC), Third Naval District, New York City, claiming that it had encountered changed conditions within the scope of the Changed Conditions clause, resulting in alleged serious slippage of soil around the edges of the dock. An equitable adjustment and a time extension were requested.

(b) More particularly, the bases of plaintiff's claim were that it had encountered changed conditions within the meaning of article 4(b), as follows:

Subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, including, but not limited to, the presence of varved layers of silt or silty clay, pockets of un-

stable soil commonly known in the New York area as "bulls-liver", cavities, boulders, piles located otherwise than shown, piles materially shorter than shown, and heavy construction work being done by others in the vicinity of Drydock No. 3; and

Unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as being inherent in work of the character provided for in the drawings and specifications in that plaintiff encountered excessive forces in the soil in and around the site which were unforeseen and unanticipated by plaintiff and the Navy.

6. (a) Under usual procedures in the Navy, construction contracts are administered in the field. The present contract was administered by the OICC who had authority to decide the changed conditions claim, subject to plaintiff's right of appeal to the chief of the Bureau, who was the contracting officer. To assist the chief of the Bureau in the decisional process, there was set up in the Bureau a Contract Award and Review Board (hereafter referred to as the Bureau board) which acted in an advisory capacity and made recommendations, after hearing, to the chief of the Bureau who, as contracting officer, made the decision which was appealable administratively by the contractor to the Armed Services Board of Contract Appeals.

(b) In the latter part of November 1955, plaintiff's president, Roger Corbetta, complained to the chief of the Bureau, Rear Admiral Robert H. Meade (who had recently assumed that office), that his company's claim had not been considered sympathetically by the OICC. Corbetta also advised Meade that his company was in financial difficulties and needed relief, without which it might have to go out of business. In these circumstances, and because the claim had been pending a lengthy period of time, Meade arranged for the Bureau board to hear the case rather than await a determination by the OICC.

7. (a) The Bureau board held three sets of hearings on plaintiff's claim. The first set of hearings was held in January 1956; the second set was held in July 1956;[1] and the final set was held in late October and early November 1956. At the end of the first set of hearings, the Bureau board informally reported to Meade that it could find no merit to the claim of changed conditions and recommended that he deny it. After the second set of hearings, the Bureau board again recommended that Meade deny it.

(b) Meade, however, on the basis of his own evaluation, was of the view that the Navy was partly to blame for the situation, giving rise to plaintiff's changed conditions claim. Meade was also aware of the fact that plaintiff was performing a major naval construction contract in the Spanish Base program and that if it didn't get financial relief and went bankrupt, both the present dry dock contract and the Spanish naval contract might have to be defaulted and that this would delay the vital Spanish Base construction program.

8. (a) Against this background, Meade met with Corbetta on August 14, 1956, to discuss plaintiff's changed conditions claim. In the course of the meeting, Corbetta stated that plaintiff was not "solicitous of receiving money because of 'being in trouble,' but rather because * * * [plaintiff was] entitled to additional moneys, in view of the many unwarranted delays and circumstances on the job."

(b) Meade then explored the possibility of converting the contract into a "cost-no-profit contract" under which plaintiff would be reimbursed for all its actual costs of construction but would not obtain any profit. Meade indicated he thought that would be an equitable solution of the problem. Corbetta said he thought so too. Meade added, however, that he would have to consult with legal counsel to determine whether this type of solution was supportable legally. About a week later, Meade was advised by Bureau counsel that he lacked legal authority as contracting officer to convert the contract into a cost-no-profit contract. Meade transmitted this advice to Corbetta, and that concluded this particular course of action.

9. (a) Despite the fact that the idea of converting the contract into a cost-no-profit contract had been nullified, two Navy employees were directed by the Bureau to make an audit of plaintiff's books to determine its direct costs for the construction of Dry Dock No. 3 from the time plaintiff started performance plus the estimated direct cost of completing the contract. The employees were told by Bernard Katz of the Bureau that the Bureau desired to obtain that figure in order to make a settlement with plaintiff. Katz was, at that time, the director of the Bureau's contract division and a member of the Bureau board.

(b) Pursuant to their assignment, the two Navy employees visited plaintiff's office on December 3, 6, 7, 13 and 26, 1956. Plaintiff's vice president, Frank Vitolo, worked with the Navy employees on this task and reviewed the matter in detail with them. He did not, during these discussions, discuss delay costs nor did he indicate that there were additional costs that had been incurred by plaintiff which did not appear in its books and records. In the course of the discussions,

1. In the interval between the first and second set of hearings, plaintiff and New York Third Naval District personnel had agreed that the restoration of the dock's crane track and utilities damaged by soil slippage would cost approximately $1,245,000. Navy personnel had concluded that the damage was due to plaintiff's fault. However, since the demolished system had been old and outmoded and since plaintiff was being directed to replace it with a better system, Navy District personnel concluded that plaintiff should be charged only for the value of the system due to plaintiff's alleged fault and should be reimbursed for the difference. Navy personnel set a value of $600,000 upon the old system, and on March 28, 1956, the OICC unilaterally issued Change Order I which increased the contract price by $645,000.

454

the Navy employees advised Vitolo that their report (hereafter referred to as the Albers-Reside report) would be submitted to the Bureau board.

10. The Albers-Reside report was submitted to the contracting officer on December 27, 1956, and contained the following data:

| | Contractor | Navy | Difference |
|---|---|---|---|
| Book cost 11/30/56 | $9,264,819 | $9,264,819 | $ |
| G & A | 463,975 | 185,296 | 278,679 |
| Total | 9,728,794 | 9,450,115 | 278,679 |
| Recommended deductions: | | | |
|   Legal and A & E fees | | −49,000 | 49,000 |
|   Estimated flood insurance claim | | −150,000 | 150,000 |
|   Profit on equipment rental | | −72,000 | 72,000 |
| | 9,728,794 | 9,179,115 | 549,679 |
| Estimated to complete | 4,795,981 | 4,203,422 | 592,559 |
| G & A | 195,003 | 84,068 | 110,935 |
| Contract at 10 percent | 479,598 | | 479,598 |
| | 5,470,582 | 4,287,490 | 1,183,092 |
| Total complete cost | 15,199,376 | 13,466,605 | 1,732,771 |
| Present contract | 9,999,584 | 9,999,584 | |
| Increase | 5,199,792 | 3,467,021 | |

The figures in the first column were those furnished by plaintiff. The figures in the second column were calculated by the two Navy employees and were discussed several times with Vitolo. The Navy representatives adopted plaintiff's book cost to November 30, 1956, but reduced the claimed overhead from 4.9 percent to 2 percent, resulting in a difference of $278,679. The Navy representatives in addition, deducted from their estimate (a) legal and engineering fees incurred by plaintiff in support of its claim; (b) an unsettled claim plaintiff had against an insurance company as a result of flooding of the dry dock; and (c) profit earned by the plaintiff-owned equipment company. No allowance was included for contingencies as contrasted with a 10 percent allowance estimated by plaintiff. As a result of these adjustments, the Navy representatives estimated the total complete cost of the contract at $13,466,605. Subtracting from that amount the contract price at that time, they estimated that $3,467,-021 was the amount needed to increase the contract price in order to enable plaintiff to recover its total direct costs and overhead. Under plaintiff's method this figure came to $5,199,792.

11. The Albers-Reside report was submitted to Meade, the contracting officer. Meade advised the Bureau board that he intended to continue to try to obtain a compromise settlement and asked the board to suggest a range of choices. The board advised Meade that the whole claim could be turned down on the ground that plaintiff was so much at fault in its construction procedures. The board also advised Meade that it was within his legal power and discretion to make a finding of changed conditions, but that if he did so, he should not go all the way in allowing the claim but rather should go part way only, since according to the board plaintiff had been so much at fault. Meade also consulted with Navy counsel. He advised them that he was concerned that a complete denial of the claim might have the consequences of not

getting the jobs done that the Navy was vitally interested in, and asked whether, if he offered a settlement based on changed conditions, it could be defended legally. Navy counsel indicated it could.

12. The Bureau board suggested to Meade a range between $2,000,000 to $2,500,000 as a reasonable negotiating range. The board obtained the figure this way. It started with the Albers-Reside report; concluded that plaintiff should receive his total overhead of 4 percent rather than 2 percent; increased the report's figure for labor by approximately $250,000; and added a contingency figure of 10 percent for possible delays beyond the control of the parties, unexpected bad weather, etc. (A contingency figure had been disallowed, as previously noted, in the Albers-Reside report.) By adding these items, the board estimated $4,000,000 as the amount the contract price would have to be increased to reimburse plaintiff for his total costs. The board then suggested to Meade that it would be fair to split this cost 50–50— with the plaintiff bearing $2,000,000 of the cost and the Navy $2,000,000. On this basis the board suggested to Meade that $2,000,000 was a fair figure for negotiating purposes, but added that if he went up to $2,500,000, it would still be a fair figure.

13. At the request of Corbetta, a meeting of the parties was held on January 3, 1957. Corbetta was plaintiff's sole representative. The Navy was represented by Meade, Captain Drustrup, the head of the Bureau board, Katz, the director of the Bureau's contract division, and Harold Gold, the Bureau counsel. Corbetta stated that his company needed monetary relief as it was in stringent financial circumstances. Meade responded that his advisers present in the room had advised him that plaintiff had not proven the existence of changed conditions and that he should turn down the claim, but that he himself felt there was some merit to the claim and that he was disposed to "stick his neck out" and disregard the advice of the other Navy men

present in the room. He added that although plaintiff was at fault to a major extent, the Navy was not entirely blameless. Meade indicated to Corbetta that as the contracting officer he had three objectives in this case—to keep plaintiff in business, to have this and the Spanish Base work completed, and to eliminate an administrative appeal to the Armed Services Board of Contract Appeals and litigation in the courts. Meade further stated that he was prepared to make an offer in settlement of plaintiff's claim on condition that plaintiff give him a final and general release for all additional costs, past and future, which resulted from the claimed changed conditions.

Meade ultimately made an offer of settlement in the amount of $2,000,000. He gave Corbetta no indication as to how this amount was determined. Corbetta stated that in addition to this amount of $2,000,000, plaintiff was entitled to the difference between the amount unilaterally awarded under Change Order I, *i. e.,* $645,000 and the $1,245,000 that the parties had mutually agreed would be the total cost for restoring the crane track and utilities system—which difference came to $600,000. See finding 7(a), footnote 1. Meade and his advisers then met privately and the latter indicated that the antiquated crane track and utilities would not have survived even the most careful kind of operation and that perhaps the $2,000,000 offer should be increased by $600,000. Thereafter, Meade stated to Corbetta that he would increase his offer to $2,600,000; that for that amount plaintiff was to go ahead, finish the dock and turn it over to him complete and ready for use; and that the $2,600,-000 was to cover fully anything that had happened in the past relating to these changed conditions, and anything that might subsequently happen relating to these changed conditions. Corbetta then accepted the offer.

14. At no time during the January 3, 1957, meeting did Corbetta mention any delay costs claims. Meade made it clear to Corbetta that the agreement consti-

tuted settlement of the entire matter. Corbetta did not indicate that he was reserving any claims.

15. After the meeting on January 3, 1957, Gold, the Bureau counsel, directed an assistant Bureau counsel, Murray H. Marker, to prepare a change order and an accompanying letter of agreement. After a draft of the proposed letter of agreement had been sent to plaintiff, representatives of the parties met in Washington, D. C., on March 12, 1957, to discuss the wording of the draft agreement and change order. Plaintiff's representatives at the meeting were its vice president, Vitolo, and its attorney, Frank Connelly. Present for the Bureau were Katz, Marker and other Bureau personnel. Meade was not present. Three principal subjects were discussed. These were requests by plaintiff's representatives that the letter of agreement provide (a) that the contractor would not be liable if driving of the crane track rails cracked the concrete walls of the dock; (b) that the contractor would not be responsible for putting in a new filter bed; and (c) that no part of the $2,-600,000 was to reimburse plaintiff for the flood damage incurred in 1955. The Navy representatives did not accede to these requested modifications.

16. (a) At the trial of the case, Vitolo testified that during the course of the March 12 meeting he mentioned that plaintiff had been substantially delayed by the conditions which it encountered, and that it had suffered damages as a result, which did not appear on its books. Vitolo further testified that Katz replied orally that the contracting officer lacked authority to award costs due to delays and that he could only extend the completion date. Connelly, counsel for plaintiff, appeared as a witness and confirmed that this conversation had taken place at the March 12 meeting.

(b) Katz and Marker both testified that they had no recollection of any such conversation at the March 12 meeting. Katz added that the statement alleged to have been made by him would not be a correct one since the Navy as part of an equitable adjustment settlement for changed conditions frequently paid delay costs directly associated with the changed conditions.

(c) Based on their demeanor, it is found that Vitolo, Connelly, Katz and Marker were all credible witnesses. It is concluded, however, for the reasons set out in finding 30 below (i) that the subject of delay costs was not discussed at the March 12 meeting; (ii) that Katz did not make the statement that the contracting officer lacked authority to award costs due to delay; and (iii) that Vitolo's and Connelly's testimony to the contrary is necessarily based on faulty recollection.

17. On the day following the March 12 meeting, Connelly wrote to Vitolo summarizing the discussions that were had at the meeting with the Bureau personnel on the previous day. There was no reference in Connelly's letter to any discussion concerning delays or delay costs.

18. A further meeting between the parties was held on March 26, 1957, at the request of Corbetta, to discuss the formal agreement and change order. Plaintiff's representatives were Corbetta and Connelly. Defendant's representatives were Meade, Gold and Marker.

Again the three items covered at the March 12 meeting (see finding 15) were discussed. Meade stressed that he wanted no change whatever in the Marker draft that would subject the Navy to potential liability for any of these three items. Meade reiterated that the proposed settlement was intended to compensate for all costs resulting from the changed or unknown conditions which were the basis of the contractor's claim, and since these conditions were no longer "unknown," the contractor would be obliged to perform the work in the light of such conditions and take whatever measures were required to deliver the contract work complete without further compensation. The only agreement reached was that the change order would specify the additional time for the com-

pletion of the contract. At no time during the course of this meeting did either Corbetta, Connelly or the Navy representatives make any reference to delays or delay costs.

19. Another meeting was held by the parties on April 5, 1957. Plaintiff's representatives were Corbetta, Vitolo and Connelly. Representing the Navy were Gold, Katz and Marker. At this meeting it was agreed that the completion time would be extended to April 30, 1958. It was also agreed that the settlement did not take into account any damage due to the flooding of the dock and that the proposed letter of agreement would accordingly specify that plaintiff did not and would not make a claim and would release the Government from any claim relating to flood damage. Finally, plaintiff's representatives were told that plaintiff would have to bear any additional costs if in the driving of piles the dry dock walls were to crack. They were further advised that plaintiff would not be held responsible by the Navy for the repair of the filter beds in their present condition.

20. (a) Vitolo testified that during the April 5 meeting he again raised the delay-cost issue and that Katz repeated that only an extension of time could be granted. He further testified that Marker affirmed Katz's response.

Connelly testified that he had no recollection of any discussion of this subject at that meeting. Katz testified to similar effect. Marker likewise testified that he didn't recall any such discussion; in addition, he denied that either he or Katz stated that the contracting officer had no authority to pay delay damages and could only extend the time for performance.

(b) It is concluded for the reasons set out in finding 31 below (i) that there was no discussion at the April 5 meeting concerning delay costs, and (ii) that Vitolo's testimony to the contrary is necessarily based on faulty recollection.

21. Immediately after the conclusion of the April 5 meeting, Vitolo wrote an extensive memorandum for the files recounting in detail what had taken place. There was no reference in that memorandum to any discussion about delay costs. Marker, too, prepared a memorandum for the files about that meeting which likewise contained no reference to any discussion about delay costs.

22. At the conclusion of the April 5 conference, Vitolo, acting on behalf of plaintiff, signed Change Order L and an accompanying letter. Change Order L provided in part:

The Contracting Officer finds that you encountered changed subsurface conditions, within the meaning of Article 4(b), in and around the site of the work and in the length of the piles supporting the crane track and utilities systems.

You are directed to furnish all the labor, material and equipment necessary to perform any and all additional work as may be required by reason of the existence of such changed conditions and to accomplish the work called for under the contract, including all addenda and change orders heretofore issued, complete, undamaged and ready for use. The contract price, pursuant to Article 10 of the contract, is hereby increased by the sum of $2,600,000, chargeable to appropriation * * *, and the time for completion is extended to and including 30 April, 1958.

You are requested to indicate your acceptance of this Change Order in the space provided therefor on the original and three copies; returning the original and two accepted copies to the Officer in Charge of Construction, District Public Works Office, Third Naval District, Room 669, 90 Church Street, New York, New York.

The accompanying letter agreement provided in part:

This will confirm our understanding with respect to the claims made by you under Contract NOy–74770 (Reconstruction of Drydock No. 3, New York Naval Shipyard, Brooklyn, N. Y.) for additional compensation for costs claimed to have been incurred and to

be incurred by you as the result of encountering changed conditions, as set forth below, in the performance of the contract work.

\* \* \* \* \* \*

The Contracting Officer, after a careful review of all the facts and circumstances relating to the claims, found that you did encounter changed subsurface conditions in and around the site of the work as the result of which you have incurred and will incur, through completion of the contract work, additional costs with respect to driving of piles, sheet-piling and soldier beams, bracing of the structure or parts thereof, demolition and excavation procedures, stabilization of soil conditions, preparation and installation of forms, pouring and reinforcing of concrete, reconstruction of the crane track and utilities system, and with respect to other elements of the work required under the contract, including all addenda and change orders heretofore issued. An audit of your books has shown costs incurred up to 30 November 1956 and costs estimated to be incurred through completion of the contract work as amounting to $5,200,000.

\* \* \* \* \* \*

The Bureau of Yards and Docks and you have reached a mutually satisfactory agreement to the effect that, under the terms of the contract, an increase of the contract price by $2,-600,000 and an extension of completion time to 30 April 1958 would constitute a fair and equitable adjustment of any and all claims for additional costs resulting from or arising out of the said changed conditions. A change order giving effect to this agreement will be signed by the parties to the contract simultaneously herewith.

23. As set out in finding 13, Meade advised plaintiff that his offer of $2,-

600,000 was conditioned on plaintiff's giving him a final and general release for all additional costs, past and future, which resulted from the claimed changed conditions. Navy procedures, however, provided for a release only at the time of final payment.[2] Therefore, the letter agreement of April 5, 1957, accompanying Change Order L, was executed in order to obtain the nearest thing to a release.

24. On October 12, 1959—some 2½ years after the letter agreement was executed—plaintiff contended that the letter agreement and Change Order L had been executed by it under economic duress or misrepresentation. It asked that the change order be set aside and that the contracting officer make a new equitable adjustment for changed conditions and grant an additional $2,600,000. The claim was denied by the Bureau and plaintiff appealed on April 4, 1960, to the ASBCA (No. 6290).

25. On February 18, 1960, plaintiff filed a further claim with the contracting officer alleging that after the issuance of Change Order I on March 28, 1956 (see finding 7(a), footnote 1), the Bureau (a) did not issue additional drawings covering the additional restoration work of the crane tracks and utilities until August 15, 1957; (b) did not give notice to proceed with a portion of this additional work until June 13, 1958, and did not instruct plaintiff to proceed with the balance of this additional work until May 20, 1959; (c) unreasonably withheld the issuance of certain drawings and instructions to proceed with respect to a portion of the transition areas until August 1959; and (d) did not provide all the necessary information and give instructions to proceed with the balance of the work in the transition areas until November 1959. Plaintiff alleged that the Bureau unreasonably delayed in furnishing the drawings and in giving notices to proceed, and that as a result, plaintiff

---

2. Final payment upon the contract, as modified by various change orders, was made on December 7, 1961. As its first claim pleaded in its petition here, plain- tiff, in substance, alleges that the payment of the $2,600,000 it received under Change Order L did not settle delay costs of $1,500,000.

incurred additional costs of approximately $950,000 in the calendar years 1958 and 1959 due to these delays in the form of wage increases, losses due to inefficiency, increased cost of winter weather performance, additional holiday pay, additional equipment, field and supervisory costs, and additional overhead expense. The contracting officer denied the claim. He found that the Government did not cause the delays; that any additional costs attributable to changed conditions had been settled in Change Order L; and that, in any event, since the claims and costs were attributed to delays and interruptions by the Government, they could not be paid by the Bureau in the absence of contract provisions not included in plaintiff's contract. Plaintiff appealed on October 12, 1960, to the ASBCA (No. 6281), noting in its appeal that because of the nature of the delay claim, it did not recognize the jurisdiction of the board to decide it under the disputes provision of the contract. The Bureau agreed that the claim was beyond the jurisdiction of the ASBCA and moved to dismiss. The board granted the motion without considering the merits and without considering the scope and legal effect of Change Order L.[3]

26. On November 22, 1961, Vitolo, acting on behalf of plaintiff, executed a release in order to obtain final payment under the contract, but excepted from such release the following specified claims:

1. Claim for an equitable adjustment for the increased costs resulting from changed conditions, and/or misrepresentations, on the grounds that the adjustment accorded by Change Order "L" was exacted of the contractor by duress. The claim was denied by the Contracting Officer's letter dated February 9, 1960 and an appeal from such denial is presently pending before the Armed Services Board of Contract Appeals as ASBCA No. 6290. The amount of the claim was stated to be approximately $2,600,-000.00, but this reservation is made in the amount of $3,000,000.00 to cover possible errors in computation.

2. Claim for increased costs resulting from delays on the part of the Government, which claim was denied by the Contracting Officer by letter dated August 29, 1960. The amount of the claim was stated to be approximately $950,000.00, but this reservation is made in the amount of $1,500,000.00 to cover possible errors in computation.

27. Connelly and Vitolo testified before the ASBCA in No. 6290 which involved (as set out in finding 24) plaintiff's claim that the settlement of April 5, 1957, had been obtained by economic duress.

Connelly testified at the board hearing that plaintiff, under the terms of the settlement letter of April 5, 1957, was accepting the money "to cover all of our losses resulting from the changed soil conditions." He testified further that "we were being paid for all consequences of changed conditions in the past or in the future." He also testified that it had been his understanding that the Navy wanted plaintiff via the settlement to release it from all losses, past and future, resulting from changed conditions, and that the Navy made this perfectly clear to him. Vitolo testified at the board hearing that during the meetings of March 12 and April 5, 1957, he raised no further questions as to the money involved since that was not his domain. Detailed reference was made during the board hearing to the meeting of March 12, 1957; however, neither Connelly not Vitolo testified that Vitolo had raised the issue of delay costs at that meeting.

28. On August 13, 1964, the ASBCA in No. 6290 found on the merits that the Change Order L agreement was valid against the challenge of duress, and denied the appeal.

29. In 1956 and 1957, it was the practice of the Bureau in settling changed condition claims to include in the equita-

---

3. This delay claim is pleaded in the petition as plaintiff's second claim.

ble adjustment various costs resulting from the changed conditions which, standing alone, were not strictly compensable under the contract. In this connection, the Navy in settling changed condition claims frequently paid delay costs directly associated with the changed conditions. However, a "pure" delay claim—*i. e.*, one not occasioned by a change or a changed condition—was not compensable administratively by the Navy.

30. Set forth below are the reasons for the conclusions reached in finding 16 (c) that the subject of delay costs was not discussed at the March 12, 1957, meeting, and that Vitolo's and Connelly's testimony to the contrary is necessarily based on faulty recollection:

(a) On the day following the March 12, 1957, meeting, Connelly wrote to Vitolo summarizing the discussions had at the meeting on the previous day. This letter contained no reference to any discussion concerning delays or delay costs. It is difficult to understand why, if discussed, Connelly would not have recorded in his letter this alleged conversation concerning delay costs which are now claimed in the amount of $1,500,000.

(b) If, as testified, Vitolo had raised the issue of delay costs at the March 12 meeting and had been told by Katz that the contracting officer had no authority to award costs due to such delays, it is reasonable to believe that Corbetta who had reached the accord with Meade on January 3, 1957, would have raised this matter and sought clarification and/or confirmation when he met with Meade at the March 26, 1957, conference. (Corbetta was present throughout the trial but was not called by plaintiff to testify.)

(c) Connelly's testimony fails to explain why he himself, as counsel for plaintiff, did not raise the question of delay costs at the March 26 meeting, particularly since he had testified that he had heard Vitolo's statement and Katz's response regarding delay costs at the March 12 meeting.

31. Set forth below are the reasons for the conclusion reached in finding 20 (b) that the subject of delay costs was not discussed at the April 5, 1957, meeting, and that the testimony of Vitolo to the contrary is necessarily based on faulty recollection:

(a) Connelly who participated in the meeting had no recollection of any such discussion.

(b) Immediately after the conclusion of the meeting Vitolo wrote an extensive memorandum for the files recounting in detail what had taken place but made no reference therein to any discussion about delay costs. See finding 21.

(c) Marker, too, prepared a memorandum for the files about that conference which likewise contained no reference to any discussion about delay costs.

## ULTIMATE FINDING ON PLAINTIFF'S FIRST CLAIM

32. (a) On January 3, 1957, the intention of Corbetta, Meade and his staff was that the $2,600,000 increase in contract price was to settle any and all claims for additional costs, inclusive of delay costs, resulting from or arising out of the changed conditions claimed. Except as to matters not relating to delay costs which were the subject of continuing negotiation, this basic intent remained constant and unquestioned through the execution of Change Order L and the accompanying letter of settlement on April 5, 1957.

(b) The parties intended by Change Order L, dated April 5, 1957, and the accompanying letter of the same date to settle any and all claims for additional costs, including delay costs arising out of the claimed changed conditions.

## ULTIMATE FINDING ON PLAINTIFF'S SECOND CLAIM

33. Prior to the execution of Change Order L and the accompanying letter on April 5, 1957, plaintiff had not incurred any delay damages as a result of the

Navy's alleged failure to provide drawings and specifications for the restoration of the crane track and utilities. Since this delay claim had not arisen nor been previously discussed as of April 5, 1957, the parties did not intend (as defendant concedes) that Change Order L and the accompanying letter constitute a settlement of this claim. Accordingly, the merits of this claim must be resolved through trial.

## CONCLUSION OF LAW

On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on its first claim, and the claim is dismissed. The court further concludes that the second claim should be and the same is remanded to the trial commissioner for trial on the merits.