**CORBETTA CONSTRUCTION COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 369–65.

United States Court of Claims.

June 16, 1972.

Frank H. Connelly, New Rochelle, N. Y., attorney of record, for plaintiff. McGovern, Connelly & Davidson, New Rochelle, N. Y., of counsel.

John C. Ranney, with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment as to Claim 3 of the petition under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on December 30, 1971, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's opinion, plaintiff urged its adoption by the court and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment on Claim 3 is granted, defendant's cross-motion for summary judgment is denied and further proceedings on Claim 3 are stayed pursuant to (and subject to the terms of) Rule 167, for 90 days to afford plaintiff an opportunity to obtain administrative consideration of the amount due it in accordance with this opinion.

## OPINION OF COMMISSIONER

WOOD, Commissioner:

The amended petition in this case, stating three separate claims, pertains to a 1953 contract between plaintiff and the Department of the Navy for the construction of a dry dock at the Brooklyn, New York, Naval Shipyard.[1] In Claim 3, presently before the court on cross-motions for summary judgment, plaintiff seeks review, under familiar standards,[2] of a decision of the Armed Services Board of Contract Appeals [3] denying plaintiff's claim to an equitable adjustment for certain subgrade repairs required of it, on the ground that plaintiff was contractually obligated to perform them.

For reasons which follow, it is concluded that plaintiff is entitled to recover on Claim 3.

Perhaps because the question administratively considered was so clearly one

---

1. Claim 1 was dismissed, and Claim 2 remanded for trial, in 1969. Corbetta Constr. Co. v. United States, 408 F.2d 450, 187 Ct.Cl. 409 (1969). It was then agreed that Claim 2 should proceed to trial, with each party's requested findings of fact and brief on the law respecting Claim 2 to be accompanied by a submission respecting Claim 3. During the course of pretrial procedures on Claim 2, however, the parties concluded that trial of Claim 2 should await decision on Claim 3. In consequence, pursuant to Rule 165(b), plaintiff was directed to move for summary judgment on Claim 3, and the parties have been directed to be prepared promptly to proceed to trial on Claim 2 following decision by the court on the pending motions.

2. Wunderlich Act, 41 U.S.C. §§ 321–22 (1970).

3. ASBCA No. 5045, 59–1 BCA ¶ 2265. The Board decision involved liability only.

of law, the Board opinion is factually rather sparse. As an aid to understanding of this claim, the indisputable, if not essentially undisputed, factual background of the controversy will briefly be sketched. Foster Constr. C. A. v. United States, 435 F.2d 873, 879, 193 Ct.Cl. 587, 600 (1970); Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 409 (1968).

The contract in suit (NOy–74770), dated August 4, 1953, was a lump-sum, fixed-price, contract requiring plaintiff to furnish the materials and perform the work necessary to reconstruct "Dry Dock No. 3" at the Brooklyn Naval Shipyard, "complete and ready for use." In general terms, plaintiff was to demolish an ancient timber dry dock, and to replace it with a substantially larger one of modern design.[4]

The contract contained standard Disputes, Changes and Extras, and Changed Conditions clauses, as well as voluminous specifications, schedules and drawings designated Specification 35705 (with Addenda 1 through 5). Because of funding limitations, the original contract called for construction of only a portion of the dry dock ultimately intended, at a lump-sum price of $8,662,-000. Subsequently, change orders (inter alia) increased the scope of the work, and raised the contract price to more than $12,775,000. The dry dock was finally accepted by the Navy as complete on February 3, 1960. Corbetta Constr. Co. v. United States, 408 F.2d 450, 452, 187 Ct.Cl. 409, 413 (1969).

The contract specifications broadly delineated the scope of the work to be performed as follows:

1–01 *General intention.* * * * to provide and secure a dry dock and its appurtenances * * * complete and ready for use.

1–02 *General description.* The dry dock of reinforced concrete construction, founded on piles, having inside dimensions approximately 770 feet long and 116 feet wide with a 41 foot depth, will be constructed on the site of the existing timber constructed, relieving type Dry Dock No. 3. The new dock consists of a relieved section of approximately 642 feet in length and a gravity section of approximately 128 feet in length * * *. Dock construction will include: a perimeter cofferdam and cellular cofferdam of the Contractor's design; the sheeting for the perimeter cofferdam shall remain in place complete; temporary dewatering facilities, to permit all construction to be done in the dry; the demolition of existing dry dock * * *; sand-gravel back fill with embedded underdrains for the new dock floor slab of the relieved section; reinforced concrete floor with embedded inserts; reinforced concrete walls providing pipe and service galleries * * *; pump well together with its flooding and dewatering appurtenances * * *.

The new dry dock was to be a "graving" one, *i. e.*, essentially a rectangular lined excavation located at the edge of the shore of a harbor or other body of water, with an entrance, and a pumping plant for removing inside water. There are several subclassifications of graving dry docks, two of which were combined in the overall design of Dry Dock No. 3. The shorter outboard section of the dry dock was of "gravity" design, incorporating a massively constructed floor and walls to ensure that the section would remain firmly in place in the mud and water bearing soil at the water's edge. The larger inboard section of the dock was of "relieved" design.[5]

5. The floor and walls of such a dry dock are substantially less massive than those of a gravity section. Consequently, a relieved section cannot depend upon its own weight to resist hydrostatic uplift and movement caused by the water in the surrounding soil. The relieved section of Dry Dock No. 3 was constructed on top of a sand and gravel filter bed. Underground water percolates into such a filter bed, and is then carried into the dock itself through relief pipes and removed by a pumping system.

4. Such an endeavor is a relatively infrequent, and highly complex, one.

Prior to commencement of excavation for the dry dock,[6] plaintiff was to drive into the ground, and surround the entire work area with, a kind of subsurface fence or wall composed of interlocking steel sheet piling. The Claim 3 dispute concerns the sheet piling, or "perimeter cofferdam", surrounding the relieved section of the dry dock at the inboard end and on the two sides.[7]

In essence, plaintiff contends that it (a) rightly, or (b) in any event, actually and reasonably, construed defendant's specifications as requiring a "perimeter cofferdam" having only the function of permitting construction "work in the dry", and (on either theory) that, after completion of the work, plaintiff was not contractually responsible for maintaining the cofferdam's integrity (i. e., its watertight character) below subgrade. Defendant asserts, however, that its specifications required, in clear and unambiguous terms, that the cofferdam serve not only to permit construction "in the dry", but also as a permanent water cut-off wall below subgrade, and that plaintiff was therefore contractually obligated to perform the repairs required at no additional cost to defendant.

Those additional specification provisions [8] relevant to decision on these conflicting interpretations are as follows:

### SECTION 2 DEMOLITION AND EXCAVATION

2–05 *Order of Procedure.* The construction methods shall be such as to accomplish the work in the dry. The methods used by the Contractor shall be approved by the Officer-in-Charge.

2–06 *Cofferdam*

a. The contractor shall provide a perimeter cofferdam of the type and in location shown on the drawings.

All perimeter steel sheet piling and steel soldier beams shall be of the minimum sizes and lengths shown on the drawings, shall be driven to the minimum penetrations specified under Section 3, "Piling" and shall remain in place after being cut off to the established elevations shown on the drawings to form a part of the permanent construction of the dock. The sizes shown are based on the assumption that the water pressure on the cofferdam sheeting will be removed as hereinafter required.

b. The Contractor will be permitted to utilize the perimeter sheet piling and soldier beams for construction purposes provided he submits shop drawings to the Officer-in-Charge for approval showing all necessary temporary wales and bracing or other modifications. * * *

* * * * * *

d. The approval of the perimeter * * * cofferdam shop drawings by the Officer-in-Charge shall not be construed as relieving the Contractor of his responsibility for the safety and adequacy of the cofferdam.

* * * * * *

2–08 *Dewatering.* The Contractor shall design, construct, operate and maintain a complete system to remove the sea water and to keep the excavation free from water during the progress of the work to the satisfaction of the Officer-in-Charge. * * *

* * * * * *

* * * it shall be the responsibility of the Contractor to devise such means and methods, subject to the approval of the Officer-in-Charge, as will adequately provide for dewatering and cofferdam to permit all construction being performed in the dry.

* * * * * *

---

6. The digging of a 20-foot trench, to elevation 76 (see n. 9, *infra*), did precede driving of the perimeter cofferdam.

7. See paragraph 1–02 of the specifications, *supra*. Neither the gravity section of the dry dock, nor the "cellular cofferdam" required for that section, is here involved.

8. Paragraphs 1–01 and 1–02 are quoted *supra*.

*SECTION 3 PILES*

3–01 *General Requirements.* The Contractor shall provide all piling as indicated, as specified, and as necessary for the proper completion of the work, including the following:

 &ast; &ast; &ast; &ast; &ast; &ast;

(c) Steel Sheet Piles

 &ast; &ast; &ast; &ast; &ast; &ast;

### STEEL SHEET PILING

3–12 *Description.* Steel sheet piling shall be driven in the locations shown on the drawings, depths indicated are considered a minimum requirement. Steel sheet piling incorporated in the work as shown on the drawings shall be left in place, cut-off at required elevations.

3–13 *Sheet piling materials.* The steel sheet piling shall be new and unused &ast; &ast; &ast;. Sheet piling shall be of an approved continuous-interlock type, as indicated on the drawings. &ast; &ast; &ast;

 &ast; &ast; &ast; &ast; &ast; &ast;

3–15 *Driving sheet piling.* Sheet piling shall be driven plumb with an approved steam hammer to the average tip elevation of adjacent soldier beams based on the estimated penetration to elevation specified, or as ordered. Piling shall be accurately placed and held in position while driving. &ast; &ast; &ast;

3–16 *Interlocking joints.* Sheet piling shall have tight vertical joints, and care shall be taken to prevent the loss of backfill and water leakage through the piling.

The contract called for the sheet piling material (which came in sections 60 feet high) to be driven to a depth of 20 feet below the lowest level of excavation the contract required for construction in the relieved section, thus creating a 20-foot "skirt" below subgrade.[9] During the driving of the piling (by plaintiff's subcontractor), a certain amount of unanticipated resistance was encountered, but the perimeter cofferdam was eventually emplaced nonetheless. Subsequently, during excavation to elevation 48, it was discovered that the soil below the surface contained obstructions,[10] principally wooden piling in the area of the relieved section, and that, in consequence, the interlocking joints connecting the individual sheets had parted or split at a number of locations (called the "split sheets") along the perimeter cofferdam.

As plaintiff encountered these split sheets it performed repairs above subgrade, sealing the gaps with lagging or patching. Had it not done so, vertical flows of water could have entered the excavation through the splits, and the specifications required "construction to be done in the dry." However, plaintiff did not then take, and was not then asked or required by defendant to take, any action below subgrade (*i. e.,* below elevation 48).[11]

After repairs to the cofferdam sheeting to subgrade, plaintiff installed the filter bed and commenced pouring concrete. By August 1955, a major portion of the placement of concrete floor slabs and walls in the relieved section had been completed. Conditions unrelated to this claim then resulted in the intentional flooding of the dry dock as a preventive measure, and work on the interior of the dock was suspended. The dock remained flooded until July 1956, when "unwatering" was initiated.

9. A point representing the approximate ground surface at the site was arbitrarily designated in the contract as elevation 100. Smaller elevation numbers represent points below that ground elevation. Thus, the top of the perimeter sheet piling was at elevation 88, the tip was at elevation 28, and subgrade (the maximum depth of excavation in the relieved section) was at elevation 48.

10. The contracting officer subsequently found that plaintiff had encountered "changed subsurface conditions &ast; &ast; &ast;." See n. 13, *infra.*

11. The split sheets invariably appeared in the form of inverted "V's". Where a split appeared above subgrade, the Board said, it "presumably" continued below elevation 48.

While above subgrade split sheets had been observed (and repaired) prior to the flooding, not until after dewatering were difficulties relating to split sheets below subgrade recognized. Some 20 or more areas of such split sheeting were subsequently found, and, on January 8, 1958, the Navy directed plaintiff to perform certain repairs [12] in these terms:

* * * it is the decision of Bureau of Yards and Docks that any repairs to the Drydock No. 3 peripheral cofferdam sheeting which are necessary due to the existing unsatisfactory sub-surface conditions are the responsibility of the Contractor under Change Order "L" and the basic contract provisions. * * * silt entering the dock through the relief pipes is apparently coming through openings in the Drydock No. 3 peripheral cofferdam sheeting. This sheeting, according to Paragraph 3–16 of the Contract Specification, should have tight vertical joints to prevent loss of back fill and water leakage through the sheeting. The fact that peat has been carried with the silt into the dock and that settlement has occurred outside the sheeting is evidence that the Contractor did not comply with the specifications and is therefore responsible for stopping the leaks and repairing any damage caused by the settlement and loss of materials outside the cofferdam.[13]

In its consideration of Claim 3, the Board accurately defined the primary issue before it as the proper interpretation of the contract specifications relating to the perimeter steel sheeting.[14] It concluded that:

* * * the specifications and drawings together clearly and sufficiently indicate that the peripheral steel sheet piling of the relieved section, in addition to its cofferdam function and other functions concededly defined therein, is to serve as a water cut-off wall below subgrade in aid of the pressure-relieving function of the upper dock.

* * * paragraph 3–16 * * * considered in the context [of other paragraphs of Section 3 and the contract drawings] expresses a clear and unambiguous requirement for tight vertical joints for the full length of the interlocking peripheral steel sheet piling, without limitation as to the 20-foot skirt below subgrade, and * * * under paragraph 3–16 [plaintiff] is contractually responsible for taking care to prevent water leakage through that piling and any resultant loss of backfill, including the filter bed. * * *

* * * the Government's present directive for the necessary correction of the three specified areas in question is in accord with the clear and

---

12. Plaintiff was specifically directed to repair split sheets below subgrade in three locations (since those three splits were believed to be causing the difficulty); gaps in the filter bed in those locations; eroded areas outside the perimeter at those locations; and a capstan. The parties are agreed, however, that decision on the "split sheet" issue is dispositive of the entire matter.

13. The split sheets were caused by the unanticipated presence of obstacles below the surface, later found to constitute, "changed subsurface conditions". By bilateral contract amendment (Change Order L., dated April 5, 1957), together with a letter of understanding bearing that same date, plaintiff was paid $2,600,-000 by reason thereof. Admittedly, however, Change Order L did not "enlarge

plaintiff's contractual responsibilities". Defendant's Brief, p. 18. Accordingly, unless plaintiff was contractually obligated to furnish a "water cutoff wall below subgrade", defendant's January 8, 1958, directive gives rise to a valid claim to payment for extra work beyond the scope of either the contract or any change order thereto, including Change Order L.

14. The Board agreed with defendant that its decision should encompass only the January 8, 1958, directive to repair three split sheets and related incidental damage, and the capstan, on the ground that other split sheets had as yet caused no problem, that plaintiff had not been required to repair them, and that any broader decision would thus be premature and speculative.

unambiguous requirements of the contract * * *.

▮ The Board's decision rested upon its interpretation of the contract, and thus was "on a question of law", within the meaning of Section 2 of the Wunderlich Act. It is therefore neither binding on the court nor entitled to any finality, but presents instead an issue to be resolved independently of the administrative decision. Jamsar, Inc. v. United States, 442 F.2d 930, 194 Ct.Cl. 819 (1971); Martin Lane Co. v. United States, 432 F.2d 1013, 193 Ct.Cl. 203 (1970).

▮ The contract in suit clearly does not state in so many words that the perimeter cofferdam should also serve as a permanent water cut-off wall. Thus, defendant obviously cannot, and does not, argue that it explicitly demanded of plaintiff a "water cut-off wall below subgrade * * *." Defendant nonetheless contends, however, that this additional function was clearly and unambiguously prescribed. This contention has no merit.

A "cofferdam" is a construction device to permit the pouring of concrete "in the dry." *Cf.* Foster Constr. C. A. v. United States, 435 F.2d 873, 193 Ct. Cl. 587 (1970). Plaintiff's contract repeatedly referred to the perimeter steel sheet piling of the relieved section as a cofferdam and, moreover, frequently did so in conjunction with allusion to construction work "in the dry." In contrast, there is no explicit mention of a water cut-off wall.[15] *Cf.* Gorn Corp. v. United States, 424 F.2d 588, 592, 191 Ct.Cl. 560, 566 (1970); L. Rosenman Corp. v. United States, 390 F.2d 711, 714, 182 Ct.Cl. 586, 591 (1968).

But, defendant asserts, the contract terms did advise plaintiff that the steel sheet piling was to have tight vertical joints and was to form a part of the permanent structure of the dry dock, and that care must be taken to prevent the loss of backfill and water leakage through the piling. From all of these provisions, defendant urges, the cut-off function of the cofferdam is obvious. The burden defendant thus seeks to impose on plaintiff is "far too onerous." Gorn Corp. v. United States, *supra.*

Given defendant's ultimate design intent (*i. e.*, that plaintiff provide a permanent water cut-off wall for the purpose of aiding the pressure-relieving function of the upper dry dock and its dewatering system by forcing all exterior waters to enter the filter bed only from below, and at a reduced volume and rate of flow), defendant's present interpretation of the contract requirements is perhaps plausible. That ultimate design intent appears, however, not from the contract itself, but from defendant's proofs before the Board.

▮▮ A government contractor cannot properly be required to exercise clairvoyance in determining its contractual responsibilities.[16] The crucial question is "what plaintiff would have understood as a reasonable construction contractor", not what the drafter of the contract terms subjectively intended. Norcoast Constructors, Inc. v. United States, 448 F.2d 1400, 196 Ct.Cl. 1 (1971); Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 195 Ct.Cl. 21 (1971); L. Rosenman Corp. v. United States, *supra.* Defendant points to nothing in the voluminous contract documents which, objectively viewed, clearly and unambiguously prescribed that the steel sheet piling of the perimeter cofferdam was to serve the further function of a permanent water cut-off wall below subgrade.

The requirement in paragraph 3–16 for tight vertical joints casts no special

---

15. The words "cut-off" do appear, but only in a context entirely irrelevant here.

16. The "duty to inquire" concept is, for obvious reasons, neither invoked by defendant nor relevant. *Cf.* L. Rosenman Corp. v. United States, 390 F.2d 711, 182 Ct.Cl. 586 (1968); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); Beacon Constr. Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963).

light; the function of a cofferdam (to permit construction in the dry) would require them. Furthermore, paragraph 3–16 does not impose on plaintiff any absolute duty to prevent a loss of backfill or water leakage through the piling, but only that of taking care to prevent such occurrences.[17]

Nor, despite defendant's reliance on it, does the fact that the perimeter steel sheet piling was to be left in place serve as any clear indication of what defendant now urges it wanted, and plainly called for. Those provisions are at least as easily, and reasonably, susceptible to the interpretation that plaintiff would not be permitted to salvage the considerable volume of steel sheet piling emplaced in the perimeter cofferdam as to that of a water cut-off function.

It is clear that, during the course of bidding and performance, plaintiff interpreted its contract as calling only for a perimeter cofferdam in the relieved section, not a permanent water cut-off wall below subgrade. Upon careful consideration of the entire contract, the best that can be said for defendant is that there is an ambiguity in its contractual language in this area. It is, moreover, one that could easily—and if defendant wanted a cut-off wall should —have been laid to rest. *Cf.* Leavell-Morrison-Knudsen-Hardeman v. United States, 436 F.2d 451, 452, 193 Ct.Cl. 949, 951 (1971); Gorn Corp. v. United States, *supra.*

■ Plaintiff's failure to glean from defendant's language any requirement for a permanent water cut-off wall below subgrade in the relieved section, and its actual interpretation of its contractual obligations to defendant insofar as that section is concerned, were at the very least reasonable. That interpretation is therefore binding on defendant. Brezina Constr. Co. v. United States, 449 F.2d 372, 196 Ct.Cl. 29 (1971); Norcoast Constructors, Inc. v. United States, *supra.* Accordingly, in requiring

plaintiff to maintain the integrity of the perimeter cofferdam below subgrade, defendant demanded work beyond the scope of the contract, for which it must pay by way of an equitable adjustment. Absent agreement by the parties, the amount of that equitable adjustment is to be determined in further administrative proceedings.

### CONCLUSION

Therefore, plaintiff's motion for summary judgment on Claim 3 is granted, defendant's cross-motion for summary judgment thereon is denied, and further proceedings on Claim 3 are stayed pursuant to (and subject to the terms of) Rule 167, for ninety (90) days, to afford plaintiff an opportunity to obtain administrative consideration of the amount due it in accordance with this opinion.

17. There is no suggestion in this case of a breach of the latter obligation. Parenthetically, there obviously was no backfill below subgrade.