**JOHN McSHAIN, INC., etc.**
v.
**The UNITED STATES.**

**No. 31–71.**

United States Court of Claims.

July 14, 1972.

Thomas S. Jackson, Washington, D. C., attorney of record, for plaintiff. H. Donald Kistler and Jackson, Gray & Laskey, Washington, D. C., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to prepare and file his opinion on the issues of plaintiff's motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on November 22, 1971, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's opinion and report and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner it hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted and judgment is entered for plaintiff with further proceedings before this court suspended pursuant to Rule 167 for a period of 90 days to permit the parties to return to the Board of Contract Appeals of the General Services Administration for initial determination of the amount of the equitable adjustment of the contract price to which plaintiff is entitled in accordance with this opinion.

## OPINION OF COMMISSIONER

HOGENSON, Commissioner:

On plaintiff's motion for summary judgment, defendant's response, plaintiff's reply, and the supporting briefs of the parties, this Wunderlich Act case places in issue on review of the administrative record the finality of a decision of the Board of Contract Appeals of the General Services Administration, GSBCA No. 2025, 66-2 BCA ¶ 5994.

The Board denied an appeal from a decision of defendant's contracting officer, and thus rejected plaintiff's claim on behalf of a second-tier subcontractor (Concrete Structures of Maryland, Inc., called Concrete Structures) of entitlement to an equitable adjustment of contract price pursuant to the standard Changes article of plaintiff's contract with defendant. In dispute is the meaning of certain provisions of the structural concrete specifications of the prime contract drafted entirely by defendant. The issues concern principles of contract interpretation relating to trade practice and language ambiguity.

It is my opinion that plaintiff's motion for summary judgment should be granted, that judgment should be entered that plaintiff is entitled to recover, and that because the Board reserved presentation of evidence as to damages until after decision of the issues of liability, proceedings in this court should be suspended for a period of 90 days to permit the parties to return to the Board for initial determination of the amount of the equitable adjustment.

The prime contract (No. GS-03B-14597) provided for construction by plaintiff, John McShain, Inc., of what is now known as the Department of Housing and Urban Development Building, Washington, D.C. Formigli Corporation (Formigli) was plaintiff's subcontractor for, and Concrete Structures was Formigli's supplier of all the precast, prestressed concrete double-tee floor and roof panels (called tee members) which comprised the basic floor and roof construction from the third through the tenth (and top) floors of the building. There were some 1,800 of such structural units.

Each of the tee members was integrally comprised of a horizontal slab, 30 feet long and 5 feet wide, and two longitudinal beams underneath such slab, such beams being colloquially called legs. In cross section of its width, each tee member appeared as a double tee. Each was integrally cast in a form at a factory, prestressed, and then transported to and lifted into place in the building under construction.

After the installation of the floor tee members, side by side and end to end on each of the floors, plaintiff was required by its contract to place on them ducts, 1.5 inches high and 14 inches wide, for the electrical system of the building, and to pour in place on each floor over the tee members and the installed ducts 4 inches of concrete fill, sometimes called topping by the parties.

In submitting its bid for supplying of the tee members, Concrete Structures interpreted the structural concrete specifications as permitting inclusion of the strength of the fill in the design of the tee members for the structural strength of 5,000 pounds per square inch, specified as hereinafter detailed. Its design calculations of such members were prepared accordingly by its licensed professional engineer, taking into consideration that the fill was to cover the specified electrical ducts, and such design was submitted to defendant's contracting officer prior to commencement of fabrication, as required by the specifications.

*Concrete Structures* also prepared shop drawings of the tee members, which were submitted with its original design calculations, and such drawings indicated that the tee members would be fabricated with roughened upper surfaces, thus indicating that Concrete Structures believed that there should be bonding between the tee members and the concrete fill to be placed thereon. No contract language specified or prohibited such roughening.

On the advice of the architect-engineer firm which prepared for defendant the structural design specifications of subject contract, including *inter alia* the drawings and specifications hereinafter mentioned, defendant's contracting officer rejected the design calculations, and directed plaintiff to design and fabricate the tee members for structural strength of 5,000 pounds per square inch, without inclusion of the strength of the fill in the design calculations. The architect-engineer firm noted the indication on the shop drawings of the roughened upper surfaces of the tee members, but stated no objection thereto, and defendant's contracting officer did not disapprove the design in that respect.

Concrete Structures then revised and resubmitted its design calculations in conformity with the directions of defendant's contracting officer. The revised design was approved, and fabrication of the tee members was thereafter accomplished in accordance therewith.

However, in connection with submission of the revised design, Concrete Structures requested an increase in compensation due to the fact that the design revision required one additional $\frac{7}{16}$ inch strand in each leg of the tee members, allegedly increasing costs in the total sum of $28,430. Before fabrication of the tee members commenced defendant's contracting officer denied the requests of plaintiff and Formigli for reconsideration of the rejection of the original design prepared by Concrete Structures, holding as a final decision that the topping (or fill) could not be considered to contribute to the structural capacity of the precast, prestressed tee members.

It is apparent from the administrative record, and no issue was raised in this respect, that the Board and the parties considered that the bid of Concrete Structures carried through and was reflected in the bids of Formigli and plaintiff.

The issues presented to the Board were whether or not there existed a trade practice with respect to the inclusion of the strength of concrete floor fill in the calculation of the strength of the precast, prestressed tee floor members, and if so what legal effect such trade practice had on the interpretation of the pertinent specifications and drawings; and if trade practice were not established as a factor to be considered, whether or not there nevertheless existed an ambiguity in contract language, as reflected by the pertinent specifications and drawings; and if an ambiguity existed, whether or not plaintiff's interpretation fell within the zone of reasonableness, without there being an obvious ambiguity such as rea-

sonably required plaintiff to make timely inquiry of defendant as to what meaning was intended by defendant, before plaintiff relied upon its interpretation in submitting its bid.

 Except for the question of the existence of a trade practice, as an aid in the interpretation of the disputed contract specifications and drawings, no issues of fact were presented to or decided by the Board. What is shown on the pertinent contract drawings is plain as a matter of fact, and only the meaning of the language and sketches thereon were in dispute. The physical qualities of the tee members to be fabricated under either the original or revised design were in issue only as to the limited question as to whether or not the pertinent structural concrete provisions by their terms, considering also the language and sketches of the pertinent contract drawings, permitted or prohibited the inclusion of the strength of the floor fill in meeting the specified structural strength of the tee members. In other words, the materials to be used and the methods of fabrication are not in dispute, but only the question as to whether additional work and materials required under the revised design constituted a constructive change, as being over and above those specified by the contract. Thus, the basic and essential issue before the Board was one of law, i. e., the interpretation of contract language, and it is well established that such an issue is for the court to decide independently of the Board's conclusion thereon, as no finality is attached to the Board's decision of a question of law under the standards for judicial review prescribed by the Wunderlich Act.

The Board correctly held, and plaintiff makes no assertion to the contrary, that the existence of trade practice is a question of fact, and that plaintiff had the burden of proof in this respect. What plaintiff does attack, however, is the Board's conclusion that plaintiff failed to sustain such burden. Plaintiff asserts that the Board erred as a matter of law in so holding, arguing that the evidence, at the least, established that it was common practice in the construction industry to include the strength of the concrete floor fill in calculating the specified structural strength of precast, prestressed concrete floor slabs, as opposed to poured-in-place slabs.

The Board also concluded that even if trade practice had been shown, plaintiff failed to prove that defendant was aware of it, or that the trade practice was well defined or so universally known that defendant was charged with knowledge of it. Plaintiff's attack upon that conclusion is that the evidence shows that defendant had notice through its agent, the engineering firm which prepared the subject structural specifications and drawings, of the existence of the trade practice.

There was no express language in subject contract documents which permitted or negated the use of the strength of the floor fill in designing the specified strength of the tee members.

Two structural engineers testified before the Board with respect to the issue of trade practice, one being called by each side of the controversy.

Plaintiff presented Mr. Ross H. Bryan, an experienced graduate civil engineer, practicing as a structural engineer and consultant in all types of construction work, specializing in the design of construction and fabrication of prestressed concrete. Mr. Bryan was a member of Committee 318 of the American Concrete Institute, which authored that society's authoritative publication called Building Code Requirements for Reinforced Concrete, cited as ACI 318 or ACI 318–63 in the subject structural concrete specifications as one of the governing codes of subject contract.

Having reviewed the subject contract specifications, Mr. Bryan testified that the tee members for the first and second floors of subject building were of the poured-in-place type, using rib joints and top slab, with topping; with the other type, used for the third floors and above, being precast, prestressed structures, with the same ribs and slabs and the

same topping. He stated that in the case of poured-in-place tee members, it was the standard practice not to use the fill as contributing to the strength of the tee members, such fill being treated as a dead load, not part of the structural system and not acting compositely with the tee members. With respect to the precast, prestressed tee members, he stated that it was a general practice to use the floor fill compositely in the design of such structures, unless the fill or topping is of such a nature that its strength precludes this being done.

Noting that subject floor fill had a specified strength of 2,500 pounds per square inch, it was Mr. Bryan's conclusion that the specified concrete floor fill was structural concrete, as the ACI 318 code listed 2,500-pound concrete as such, with certain allowable stresses and properties.

Having reviewed the original design of the subject tee members, as submitted by Concrete Structures, Mr. Bryan stated that such supplier used the floor fill as structural concrete in accordance with the ACI 318 code standards, and designed the tee members, using the fill as a structural portion thereof. He testified that such design was standard practice in the industry, in the absence of express contract instructions not to use the topping as a structural fill. He correctly stated that there were no such contract instructions. He stated that in such practice, the upper surfaces of the precast tee members are roughened to permit bonding with the floor fill. He conceded that the subject contract did not mention such roughening.

Defendant presented Mr. Matthys Levy as a witness before the Board. An experienced graduate civil engineer and Associate Professor in the field of architectural structures at Columbia University, he had for several years been a partner in the architect-engineer firm which drafted for defendant the structural specifications and drawings of subject contract, and particularly those re-lating to structural concrete. His firm was retained by defendant to check all of the contractor's shop drawings and to provide periodic supervision in the construction of subject building. In particular, his firm reviewed the initial design of subject tee members, prepared by Concrete Structures, and disapproved it as not complying with contract documents, because such design included the strength of the floor fill in the calculation of the strength of the precast tee members.

Conceding that there was no express language permitting or prohibiting the inclusion of the strength of the floor fill in such design, Mr. Levy's opinion nevertheless was that the provisions of the structural concrete specifications and the pertinent drawings otherwise evidenced clearly that the tee members were to be designed without inclusion of the strength of the floor fill. On the assumption that the contract language permitted such inclusion, which he denied, he conceded that he had no disagreement with the technical testimony of Mr. Bryan, although he disagreed with the extent of the existence of the trade practice.

With respect to Mr. Bryan's testimony that it was industry practice to include the strength of the floor fill in designing the structural capacity of precast, prestressed tee members, Mr. Levy stated: "I think I would agree that in many cases the structural fill is used as part of the section. But in a good many cases it is not, especially where electrical ducts are included in the fill and electrical conduits." Queried as to whether he meant that where electrical ducts are imbedded in the floor fill, it was not industry practice to include the fill for the purpose of determining the structural capacity of the precast, prestressed tee members, Mr. Levy replied: "I can only state on the basis of my own experience, where we have used electrical ducts, we have not taken the fill." The summation of Mr. Levy's testimony with respect to trade practice is contained in the fol-

lowing questions and answers set forth in the transcript of the Board hearing:

*Hearing Examiner Hersh:* I gather what you are saying is Mr. Bryan, without exception, is not quite accurate—his statement was not quite accurate in your opinion?

*The Witness [Mr. Levy]:* Without exception, that is correct.

*Hearing Examiner Hersh:* In other words, you are saying it can be done both ways?

*The Witness:* That's correct.

Mr. Levy explained that in drafting the pertinent specifications, he did not want to use the fill structurally because he felt that the flexibility of the building would be hindered, and if the Government at some future time wanted to make a change in the layout of the electrical ducts, it could do so very simply if the fill were not part of the structure, whereas otherwise this could not be done. Such reasoning was undisclosed in the contract documents. Queried by the hearing examiner as to whether it wouldn't have been wise, if it was intended that the fill could not be considered to contribute to the structural capacity of the pertinent tee members, to have stated precisely that in the specifications, Mr. Levy replied that after the fact, he agreed, but that he thought he had enough in the drawings and specifications to eliminate the fill.

On rebuttal, Mr. Bryan explained that he had had extensive experience throughout the United States, and that it was common practice in the industry to use floor topping structurally. He conceded that on occasion the topping is not so used, but that it was more common to use the topping as structural concrete.

■ From a review of the entire record in this case, it is my opinion that the Board erred in its conclusion that plaintiff failed to sustain its burden of proof with respect to trade practice. Full consideration has been given to the principle that the court should accept the evaluation by a board of the credibility and weight to be given to conflicting testimony of witnesses, unless the testimony accepted is inherently improbable or discredited by uncontrovertible evidence or physical fact, and that of two probable versions of facts, the court would normally be constrained to favor the version accepted by such a board. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966). However, under the circumstances of this case, and upon consideration of the administrative record as a whole as required by the principle stated in Carlo Bianchi & Co. v. United States, 167 Ct.Cl. 364, 368 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965), it is held that the Board's conclusion that there was a failure of proof is not supported by substantial evidence. The only reasonable finding of fact that can be made in this case is that the original design of the precast tee members, prepared and submitted by Concrete Structures, was in conformity with a widespread practice in the industry in that the strength of the floor fill was included in the calculation of the specified strength of the precast tee members.

It is also my conclusion that the Board erred in holding that plaintiff failed to sustain its burden of proof that defendant was aware of the claimed trade practice, or that such practice was well defined and so universally known that defendant was charged with knowledge thereof. The architect-engineer firm which drafted the pertinent specifications and drawings for defendant was aware of the existence of such common practice, and should reasonably in accordance with its intention have negated the use of such practice by express language in the specifications, unless it is to be held that the drafted provisions obviously indicated an intention contrary to the trade practice. Certainly defendant must be charged with the knowledge of the agent which it employed to draft the contract language in dispute.

Consideration must now be given to the question of law, to be decided by the court independently of the conclusion

thereon reached by the Board, as to whether the pertinent specifications and drawings should be interpreted as permitting or prohibiting the inclusion of the strength of the floor fill in calculating the specified strength of the precast, prestressed tee members.

The pertinent provisions of the contract specifications are set forth in Section 8 thereof entitled Concrete.

Paragraph 8–01, General, lists a number of publications as governing codes, with any modifications thereof to. be specified, and one of such publications is: ACI 318, Building Code Requirements for Reinforced Concrete, American Concrete Institute.

Paragraph 8–02, Materials, specifies that materials shall meet the requirements of various publications, and with respect to aggregates, lists *inter alia* a publication of the American Society for Testing Material Standards: Aggregates for Lightweight Floor and Roof Fill: C 330.

Paragraph 8–05a, Strength of Concrete, provides in subparagraph b thereof:

b. Fill over structural floor and roof slabs shall be 2500 psi, lightweight concrete.

Paragraph 8–10, Lightweight Concrete, provides:

a. Lightweight concrete floor and roof fill shall weigh not more than 110 pounds per cubic foot, air dry unit weight, with minimum 28 day compressive strength of 2500 psi.

Paragraph 8–34, Precast Prestressed Concrete, provides in pertinent parts:

a. These specifications cover all the materials, design, fabrication, transportation and erection of all precast, prestressed concrete members as shown on the drawings.

e. Design. The precast prestressed concrete members shall be designed in accordance with the latest edition of the Building Code Requirements for Reinforced Concrete ACI 318 and shall be based on "Working Stress Design". Maximum deflection shall not exceed

L/360, where "L" is the span of the member. Design computation shall be submitted to the Architect for approval prior to fabrication. The strength of concrete at transfer shall be 5000 pounds per square inch.

\* \* \* \* \* \*

k. Performance Test: When required by the Service, a performance test shall be executed on a member selected at random by the Service. For approval of the lot, the member tested shall meet the following minimum requirements:

1. Dimensional and camber tolerances as described above.

2. Upon application of the design live load, the deflection shall not exceed the calculated deflection by more than 10 per cent.

3. The member shall be loaded to 1½ times the design live load and deflection measurements shall be made. Upon removal of the load, the member shall show a recovery of at least 80 per cent of the measured deflections.

4. All testing shall be performed in presence of the Service's representative.

In addition to the foregoing specifications, contract drawings numbered 7–31 and 7–32 are pertinent to the issues in this case.

Drawing 7–32, Typical Details, Miscellaneous Plans and Sections, Structural, sets forth *inter alia* a cross section of the width of a tee member, representative of both the precast and cast-in-place types, and the floor fill is not shown on such sketch. Also set forth is a cross section of the widths of a series of precast tee members placed side by side, and such sketch does not portray the floor fill. However, a longitudinal cross section of a floor indicates a 4-inch concrete fill over the tee members.

Drawing 7–31, General Notes, Loading Schedule, Typical Details, Structural, sets forth two general notes as follows:

1. The structural drawings shall be used in conjunction with the specifica-

tions, architectural and mechanical drawings.

2. Design is in accordance with the ACI 318–63 as follows:

a.) Columbus designed in accordance with Part IV–B (ultimate strength)

b.) All other cast-in-place and precast work in accordance with Part IV–A (working stress design)

Notes 2 and 9 under the heading "Reinforced Concrete" provide:

2. Structural concrete shall develop the following strengths at 28 days:

| Location | Strength | Aggregate type |
|---|---|---|
| Precast Prestressed member | 5000 psi | Stone |
| * * * * * * | | |
| All cast-in-place | 4000 psi | Stone |
| * * * * * * | | |

9. Design calculations of the precast prestressed members shall be performed by a licensed professional engineer. Design shall be based on ACI 318 latest edition, Part IV–A.

Design calculations shall be submitted prior to the fabrication of the members for approval. * * * Design live load as shown on this Dwg.

The pertinent part of the Loading Schedule of such drawing is as follows:

Typical Floors: (3rd, 4th (excluding computer area), 5th, 6th, 7th, 8th (excluding library area), 9th and 10th)

Live Load:
(a) Office area w/partitions .............. 80 + 20 PSF
(b) Corridors ........... 100 PSF
(c) File storage area .... 110 PSF
4″ lightweight fill ........ @ 9 PSF/inch thickness
Ceiling ................ 4 PSF
Slab system ............ Actual weight

■ Intrinsically involved in the determination of the meaning to be given to the pertinent specifications and drawings are the facts that no express language negated the inclusion of the fill strength in calculating the specified strength of the precast, prestressed tee members, that trade practice supported plaintiff's interpretation that the fill strength was to be included, and that plaintiff submitted its contract bid on that basis. In view of the complexity of the specifications, these facts in my opinion reasonably require the conclusion that plaintiff's interpretation falls

within the zone of reasonableness, WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963) as trade practice is of substantial significance in the interpretation of disputed contract language, Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 999, 173 Ct.Cl. 374, 395 (1965).

■ However, because defendant's Instructions to Bidders relating to subject contract called for submission in writing by a bidder of a request for any explanation of the meaning or interpretation of the specifications and drawings before submission of a bid, plaintiff's entitlement to rely upon its interpretation must be tested on the principle that if it was confronted with an obvious ambiguity, it was required to consult defendant concerning defendant's intention with respect to such ambiguity, before relying upon its own interpretation in the submission of its bid. Beacon Constr. Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7 (1963).

■ Of course, such rule of law does not require a bidder to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation, but only as to patent or obvious discrepancies, or drastic conflicts in provisions, as the defendant, as author, has to shoulder not only the major task of seeing that within the zone of reasonableness the words of the agreement establish with reasonable clarity the meaning intended by defendant, but also the major risk of failure in that respect, WPC Enterprises, Inc. v. United States, supra, 323 F.2d at 877, 163 Ct.Cl. at 6.

As relied upon by the Board in its decision sustaining defendant's position, various reasons were advanced by defendant as to why the specifications and drawings clearly or obviously show the meaning intended by defendant. Although defendant does not fully reargue such reasons in its brief to the trial commissioner, it reaffirms its position entirely in this court by requesting that the Board's reasons be incorpo-

rated in its brief by reference. Such reasons bear some degree of plausibility, if viewed only from the standpoint of the drafting architect, bearing in mind that he had the undisclosed purpose to have the floor fill not included in the structural strength of the floor members to permit any future changes in the layout of the electrical ducts within the floor fill. But from the standpoint of the plaintiff, relying upon trade practice to submit a competitive bid based upon less expensive construction in the respect involved in this case, such reasons do not establish the patent or obvious discrepancies, and certainly not the drastic conflicts in provisions, which would reasonably have required plaintiff to inquire of defendant as to what was meant by the specifications and drawings, prior to submission of the bid.

Thus, emphasis is placed on the use of the word "over" in paragraph 8–05a (fill over structural floor and roof slabs shall be 2500 psi, lightweight concrete), but such language does not negate the trade practice involved in this case, as where else would the floor topping be located. Also, the governing code ACI 318, expressly made subject to modifications to be specified by defendant, lists lightweight concrete, 2500 psi, as structural concrete. There is no obvious modification in defendant's specifications of this code in this respect. Drawing 7–31 specified stone aggregate in accomplishing the specified structural strength of the precast tee members at 5000 psi, and of the cast-in-place tee members at 4000 psi. Stone aggregate could not be used in the lightweight floor fill, as is established by uncontradicted expert testimony in this case, but the specifying of stone aggregate in the tee members does not clearly and obviously eliminate the use of the strength of the fill in calculating the specified capacity of tee members, simply because stone aggregate could not be used in the lightweight floor fill.

The absence on the structural drawing of the cross section of the width of the precast tee member of any indication of floor fill does not obviously eliminate application of the trade practice involved in this case. Also, the testing requirements of the tee members, indicating that such tests were to be conducted solely on each member, without the presence of fill, do not obviously speak that such tests contemplated elimination of the strength of the fill in determining the structural strength of the tee members. The same must be said of defendant's technical analysis of the loading schedule set forth on drawing 7–31.

To sustain defendant's position in this case, it would be necessary to reach the unreasonable conclusion that plaintiff had the burden, before submitting its bid, to search through the complex specifications for plausible, but unclear, indications that defendant's intention was contrary to the trade practice involved in this case. Plaintiff had no such burden, but was entitled to rely upon its reasonable interpretation of the disputed contract language.

## CONCLUSION

Upon the basis of the foregoing opinion which is adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff's motion for summary judgment is granted, that judgment is entered that plaintiff is entitled to recover, and that proceedings before this court are suspended for a period of 90 days to permit the parties to return to the Board of Contract Appeals of the General Services Administration for initial determination of the amount of the equitable adjustment of contract price.