**L. ROSENMAN CORPORATION**

v.

**The UNITED STATES.**

No. 211–65.

United States Court of Claims.

Feb. 16, 1968.

Jerome Reiss, New York City, for plaintiff, Max E. Greenberg, New York City, attorney of record.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

DURFEE, Judge.

This action arises out of a Government contract between plaintiff, L. Rosenman Corporation (hereafter referred to as "Rosenman") and General Services Administration (hereafter referred as as "GSA") for "Air Conditioning Phase II" of a Federal Office Building located at Vesey and Church Streets in New York City.

The controversy here involves the interpretation of the contract. Specifically, the dispute involves the contracting officer's direction to furnish approximately 900 automatic steam radiator valves for those radiators located on the 8th through the 15th floors of the subject building. Plaintiff contends that the contract did not require installation of radiator valves on these floors and as a consequence, the contracting officer's order to install such valves represents a change in the contract for which plaintiff is entitled to an equitable adjustment. The contracting officer denied plaintiff's claim for an equitable adjustment.

██ Upon appeal, the General Services Administration Board of Contract Appeals (hereafter referred to as the "Board") divided evenly on the question of liability.[1] Nevertheless, the members of the Board unanimously agreed that in cases of a tie the decision of the contracting officer should prevail.[2] Hence, plaintiff's appeal was dismissed. We conclude, however, that plaintiff is entitled to an equitable adjustment for performance beyond that required by the contract.

The disagreement between plaintiff and defendant centers around the technical drawings (floor-plans) for the individual floors of the building. The floor plans for the first five floors show a broken line running from the thermostats to the radiators. The drawing for floor six contains a similar representation. The plans for floors 8 through 15 do not contain the broken line running from thermostats to radiators. It was understood by both parties that automatic radiator valves would be installed only where the radiator was to be connected to a thermostat. A radiator not so connected would not have any need for an automatic valve, but would be regulated solely by the existing automatic zone-controlled system. Since the

1. Since there was no majority decision by the Board, there are no findings of fact which can be accorded finality as would otherwise be required by the Wunderlich Act, 41 U.S.C. § 321.

2. Although the Board may be able to rest its decision on the conclusion of a contracting officer in certain instances, we certainly cannot do likewise and accept the contracting officer's findings of fact as if they had been found by the Board and then accord those facts finality. The Wunderlich Act was intended to apply only to proceedings in which the basic guarantees of procedural due process are adequately protected. See, H.R.Rep.No. 1380, 83d Cong., 2d Sess. U.S.Code Congressional and Administrative News, p. 2191, cited in United States v. Carlo Bianchi & Co., 373 U.S. 709, 717, 83 S. Ct. 1409, 10 L.Ed.2d 652 (1963); cf., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941). The *ex parte* decision-making process of a contracting officer does not provide these guarantees.

drawings for floors 8 through 15 did not indicate any connection between the thermostats and radiators whereas the drawings for the first five floors plus floor six [3] did so indicate, plaintiff reasonably assumed from the beginning that the contract did not intend valves for floors 8 through 15. Defendant, however, contends that the omission of the connecting lines does not negate the clear directions of the specifications [4] and the detail drawing [5] to install automatic radiator valves throughout the entire building including floors 8 through 15. The omission of the connecting lines, at best, argues defendant, creates a patent discrepancy with the contract specifications and detail drawings which gives rise to an affirmative duty upon plaintiff to seek clarification.

Defendant's arguments must be answered in two parts to correspond to the two legal issues raised. The first issue is whether the contract was so clear as to make the omission of the broken lines a patent and glaring error. Since we answer this in the negative, the second issue must also be reached, viz., whether plaintiff's interpretation of the contract was reasonable and justifiable.

Regarding the first issue, we agree with defendant that the burden is on a contractor to seek clarification in cases of patent discrepancy (See, Ring Constr. Corp. v. United States, 162 F. Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Consolidated Engineering Co. for Use of Fulton Nat. Bank v. United States, 98 Ct.Cl. 256, 280 (1943), but such is not the case here.

What constitutes a patent and glaring omission cannot, of course, be defined generally but only on an *ad hoc* basis by looking to what a reasonable man would find to be patent and glaring. In this case, three members of the GSA Board of Contract Appeals did not think the valves were *clearly* required. (In fact, they thought the valves were *clearly not* required). Plaintiff's temperature control sub-contractor, who had some expertise in the air-conditioning system of this specific building,[6] did not consider the valves to be clearly required by the contract. It, too, believed the valves were clearly not required from the very beginning when it first submitted its bid to plaintiff.[7] Nor do we think the contract specifications and detail draw-

---

3. Floor six is emphasized here because the same type of air conditioning equipment was being installed on this floor as on floors 8 through 15. Due to physical differences of room sizes, the lower five floors contained a slightly different type of air conditioning system which had been installed as part of the "Air Conditioning—Phase I" contract. It is not necessary to decide whether this distinction (i. e., between the two types of systems) has much probative weight regarding the significance of the omission of the broken lines. It need only be pointed out that the broken lines were used in the drawings for both parts of the building (corresponding to the two types of air-conditioning systems).

4. Para. 24-86 (Specifications):
*Periphery Unit Control*
In each space, as indicated on the plans, a dual-summer-winter-room thermostat shall be located to control the operation of the periphery air-conditioning unit, and the radiator valves.

\* \* \* \* \*

5. Detail Drawing 27–120, entitled "Central Air Conditioning Automatic Temperature Control", outlined the periphery unit control, among other things, running from it both to a radiator and to a periphery unit. Another broken line ends with an arrow pointing to the words "to additional units as shown."

6. The Johnson Service Co., plaintiff's contract sub-contractor, had participated in the installation of Phase I of the Air Conditioning System in this building as well as in the design of Air-Conditioning—Phase II.

7. Mr. Tisdale, a Sales Engineer for Johnson Service Co., testified before the Board that Johnson did not include the cost of valves for floors eight through fifteen in its bid it submitted to the prime contractor (plaintiff) based on its reading of the contract requirements.

**714**

ings were so clear as to create a duty to seek clarification of the omission of the broken lines. Although the specifications and drawings may have been clear as a bell in the mind of defendant's architect, it is not the subjective intent that is the legal determinant. National Movers Co., Inc. v. United States, Ct.Cl., 386 F.2d 999 p. 1001 decided November 9, 1967. Rather, it is the representations of the specifications and drawings themselves which represent defendant's intent. And these were not so clear as to compel plaintiff to seek clarification, or as to make defendant's interpretation binding upon plaintiff. See, Tufano Contracting Corp. and Anthony Grace & Sons, Inc., Joint Venture v. United States, 356 F.2d 535, 539, 174 Ct.Cl. 398, 405 (1966). "The Government, as the author [of the contract] has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility." WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963). Here defendant did not meet its burden. If it had wanted automatic radiator valves on all 15 floors, it should have said so explicitly. Even the Government witness conceded that there was no way of telling from the floor plans that automatic valves were intended for the 8th through the 15th floors.

■ Since we find that defendant's plans and specifications were not so clear as to make its intepretation binding on plaintiff, we must next proceed to the second issue, the formulation of which is based on the well-defined principle that "when the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that construction be adopted." Peter Kiewit Sons' Co., et al. v. United States, 109 Ct.

Cl. 390, 418 (1947) cited with approval in WPC Enterprises, Inc. (supra); cf., Maxwell Dynamometer Co. et al. v. United States, Ct.Cl., 386 F.2d 855 p. 867, decided November 9, 1967. Thus, we need only look to see whether plaintiff's interpretation of the contract requirements was reasonable.

■ We think that plaintiff was reasonable both in the manner it interlaced the various parts of the contract as well as its substantive interpretation of the contract provisions and drawings.

The procedure adopted by plaintiff for interpreting the contract was the orthodox procedure of looking to *both* the detail drawing (cited in fn. 5, supra) and the individual floor plan, and reading the former into the latter as directed. The specifications required the installation of thermostats and radiator valves "as indicated on the drawings" (cited in fn. 4 supra). As pointed out earlier, the floor plans for floors 8 through 15 did not indicate any connection between the thermostats and the radiators, whereas the floor plans for floors 1 through 6 did indicate such a connection. In addition, there were specific notations on the floor plans for floors 1 through 4 and 6 to apply the said Detail Drawing to these floors, whereas the floor plans for the disputed floors, viz., floors 8 through 15, did not have any such notation.[8] Thus, it was perfectly reasonable to assume that the specifications and Detail Drawing directed plaintiff what to do, and the floor plans indicated where to do it.

The ultimate result of plaintiff's interpretation was also a reasonable one. Plaintiff concluded that the purpose of eliminating the valves for floors 8 through 15 was to effect a cost saving. This certainly is a reasonable interpretation. It also was not unreasonable in light of the entire contract since, even without the automatic valves on the disputed floors, the heating performance

---

**8.** The notation was, in effect, another explicit signpost used in this contract to direct the contractor or where not to install the automatic valves.

standards imposed by the specifications would be satisfied. The Government witness, Mr. Losordo, admitted on cross-examination that an adequate heating system had been provided by plaintiff. The fly in the ointment is that the Government just did not get what it had hoped it would get. But we think it got what the contract reasonably called for. That is all that it is entitled to under these circumstances.

For these reasons, we hold that the directions of the contracting officer to install automatic radiator valves on floors 8 through 15 was a change in the contract for which plaintiff is entitled to an equitable adjustment.

It is therefore ordered that plaintiff's motion for summary judgment be granted, that defendant's motion for summary judgment be denied. Proceedings here will have to be suspended so that the parties can return to the General Services Administration Board of Contract Appeals for determination of the amount due plaintiff. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 430, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).