**NORCOAST CONSTRUCTORS, INC., and Morrison-Knudsen Company, Inc., a joint venture,**

v.

**The UNITED STATES.**

No. 376–68.

United States Court of Claims.

Oct. 15, 1971.

Davis, J., filed opinion concurring in result.

Lyle L. Iversen, Seattle, Wash., attorney of record for plaintiff. Lycette, Diamond & Sylvester, Seattle, Wash., of counsel.

R. W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This is another proceeding, before us on cross-motions for summary judgment, to review a disputes clause decision of the Armed Services Board of Contract Appeals (ASBCA) under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–322. We have jurisdiction under 28 U.S.C. § 1491. The plaintiff, a joint venture, entered into a negotiated Contract, DA 95–507–Eng–2112 (NEG) with the Army Engineers, having the usual standard Change Order and Disputes provisions. The work was in support of Project Long Shot, the underground explosion of a nuclear device at Amchitka, Alaska, a remote island in the Aleutians. Plaintiff was to do various items of work, totalling $4,222,780. Among these were the supply of gasoline and diesel fuel, as required, including storage, dispensing, and transport about the island on plaintiff's tank trucks. One item, No. 43, was:

Furnish and Install Diesel Fuel
Storage Facilities ........ $139,900.

In fulfillment of this item, plaintiff constructed on the island two welded steel tanks for the diesel fuel, of 18,000 and 6,000 barrels capacity, respectively. After the contract was otherwise performed in full, plaintiff and defendant both claimed to own these tanks. That is the entire dispute. The ASBCA held for the defendant, but we disagree. Its construction of the contract is erroneous

as a matter of law, and rests on some subsidiary fact findings that do not have the support of substantial evidence. Plaintiff is entitled to an equitable adjustment, for a constructive change order. As the Board postponed consideration of quantum, we will suspend proceedings here to enable it to determine that issue.

Plaintiff was one of four bidders. The original specifications on which it bid left the capacity and kind of the diesel fuel storage facilities unstated and within the contractor's discretion, in light, evidently, of the anticipated rate of use and frequency of arrivals of tankers at the island. The estimated overall quantity of diesel fuel to be supplied was 950,000 gallons. A specification (21–05) provided in part:

\* \* \*. Gasoline shall be stored in barrel or other approved containers. The locations, methods and quantities of diesel fuel storage shall be as indicated on the drawings or as approved by the Contracting Officer.

A drawing showed a 50,000 gallon "pillow tank" as a "typical installation detail," for diesel fuel storage. The term "pillow tank" recurs constantly in the record, is nowhere defined, and is unfamiliar to the court. Counsel on oral argument here stated that it was a rubber portable container, having a relatively short useful life, as compared to a steel tank. The pillow tank in the drawing is bedded in sand which is dug away beneath it and built up around its sides: thus apparently supporting the tank and restraining escape of fuel in case of a rupture. The tank, full, resembles in shape a bed pillow, no doubt thus accounting for the name.

Before the award to plaintiff the parties, on March 23rd and 25th, 1965, had two conferences, the minutes of which were taped and made a part of the contract by contract stipulation. Defendant's representatives wanted to know how plaintiff would "handle" petroleum. Plaintiff's representative, Mr. Egge, said they had located "on the shelf" a

new 500,000 gallon bolted tank, and they would use this for diesel fuel, with pillow tanks. Mr. George, for defendant, said the bolted tank would leak, as their experience showed. They urged no objection to pillow tanks. There was much discussion about the alleged leaking of the bolted tank and plaintiff failed to convince that it would not leak, but on the other hand, defendant did not flatly disapprove it, apparently expecting not to pay for any fuel that leaked out.

After these conferences, but before final signature of the contract, the parties made alterations in it, including a new specification (21–06) to follow the one previously quoted:

> 1. There is "no serious objection" to the use of pillow tanks for * * * Diesel oil if the following precautions are taken: [precautions follow]

Though the minutes do not so reflect, plaintiff during or after the conferences decided to buy and install the welded tanks. According to Mr. Egge's testimony, it was because of the fear of leakage from a bolted tank, but the Government did not participate in the decision, nor specify the design of the tanks. There is no evidence that plaintiff communicated the decision to defendant prior to the award, and the new specification 21–06 suggests that plaintiff did not. After the conference the contract right of plaintiff to furnish only rubber pillow tanks thus not only subsisted but was re-emphasized. The record shows pillow tanks were cheaper to install, and why plaintiff did not use them exclusively is a question to which the record gives no clear answer. Mr. Egge did testify "we wanted to get the contract and we figured that this was an item that might please them if we furnished the welded tanks." Plaintiff also hoped that its ownership of these tanks in place on Amchitka would enable it to underbid competitors for future Government contracts involving Amchitka. This hope was not communicated to defendant so far as appears.

Plaintiff after award sent a crew of boilermakers to Amchitka to assemble and weld the tanks. The evidence shows without contradiction that this on-site assembly cost more than the unassembled parts and also that the tanks would have had some salvage value if they had had to be removed, despite the necessity of cutting them up for shipment out. Mr. Egge figured that the tanks were worth about $180,000 in place at Amchitka.

Shortly after the award defendant presented plaintiff with a change order specifying, among other things, what items that plaintiff had installed would remain property of the Government (SC–48). This list did not include the welded tanks. The amendments then made to Specification 21 also say nothing about these tanks.

Defendant allowed plaintiff to remove its pillow tanks without any argument, when the contract was performed. The steel tanks had to be left there as they still had oil in them. The Board says plaintiff had used the pillow tanks for "its convenience" thereby somehow differentiating them from the steel tanks.

 The Board holds that the welded steel tanks (but not the pillow tanks) were an "inducement" for award of the contract. Defendant's capable counsel admitted in argument that the alleged "inducement" to defendant could not be found in the written contract and in effect was an oral modification thereof. Possibly defendant wants us to reform the contract as not reflecting the true agreement of the parties. The first question is one of proof. It can hardly be doubted that the party relying on an oral modification must be the one to prove that it was made. Defendant offered nothing to show when or how the "inducement" was communicated to it. The Board made no finding how it was communicated. Defendant's counsel here relies wholly on Mr. Egge's testimony, already quoted, that they wanted the contract and figured the welded steel tanks might please the Engineers. Plaintiff ordered the tanks on March 30th, 1965, five days after the second

conference. Presumably plaintiff then knew it was getting the contract, which is dated March 29th, though it was not signed until May 3rd. Mr. Egge further testified that they decided what the capacity of the tanks would be only after they received notice of award. The "inducement" theory makes notice of award the significant date. We think defendant, to have a tenable argument, would have to show that defendant had received some undertaking from plaintiff, before the award date, that plaintiff would furnish welded steel tanks of stated capacity. If capacity were not given, the undertaking would not be specific enough to be contractual, for plaintiff had the right to use rubber pillow tanks to provide any portion up to all of the capacity needed. And that is not all the difficulty. The "inducement" is supposed to be an undertaking to surrender title to the tanks, though Mr. Egge only testified he hoped the Engineers would be pleased if he "furnished" the tanks, the very term whose meaning, in the contract, is in dispute. In the absence, in the record, of any document or testimony showing receipt of the alleged undertaking by defendant's officers, we think Mr. Egge's wish to get the contract and please the Engineers is not substantial evidence that any such undertaking was conveyed, in time to be an "inducement" for the award. Thus the Board's "inducement" finding lacks support in substantial evidence and is disregarded in our analysis of the applicable law.

There is in the record a letter dated March 25th, 1965, from an unsuccessful bidder, proposing to furnish twelve 50,000 gallon pillow tanks for diesel fuel. It expressly states that the tanks will be Government property. This should have alerted defendant's officials to the absence of any such express undertaking from plaintiff, and shows too, that another bidder thought the point needed clarification.

The Board predicated its decision for defendant in part also on its belief that payment to plaintiff of $139,900 "adequately compensated" plaintiff for title to the tanks in place. This too lacks support in substantial evidence. Mr. Egge testified the tanks in place were worth $180,000. The opposing testimony is remarkable. Mr. Lohre, an employee of the Corps of Engineers, testified he phoned two suppliers and asked for quotations for 18,000 and 6,000 barrel tanks, delivered in place at Amchitka. These calls he apparently made in course of preparing to testify. The quotes were, he said:

> Union Tank Co. .........$146,000
> Chicago Bridge & Iron ... 86,000

He discarded the second as obviously too low. It is evident, however, that hearsay apart, neither is of any probative value, since neither, so far as appears, were more than off the top of the heads of the persons at the other end of the telephone line. Neither would have made a site inspection on Amchitka or done the other things anyone would have done before making a firm bid. Mr. Lohre apparently selected as persuasive the Union Tank bid because it agreed more closely with defendant's litigation position, but the wide spread of itself discredits both these guesses. Actually, determination of the value of the tanks in place was premature and should have been left to the hearing on quantum. If the Board should turn out to be right, the award will be small and no injustice to defendant will result.

Defendant here also attempts to show that if it does not get the tanks, it was paying 2½ times more per unit for storage and handling of diesel oil than for gasoline. There was in fact no separate storage item, like item 43, for gasoline. The estimated quantity of gasoline to be stored was less, 230,000 gallons against 950,000. Plaintiff used two steel tanks, each 6,000 gallon, not barrel, capacity, for gasoline, with pillow tanks. (As units of measure in the petroleum industry, one barrel equals 42 gallons.) So far as appears, the quantities of gasoline to be stored at any one time, may not have been proportionate with the

amount of necessary storage of diesel fuel. The 18,000 barrel and 6,000 barrel welded steel tanks, with 200,000 gallons of pillow tank capacity, add up by this court's mathematics to 1,208,000 gallons, the amount of diesel fuel plaintiff thought it had to be able to store at one time. There is no corresponding figure of the amount of simultaneous storage it thought necessary for gasoline. The pillow tanks were "highly portable" and there is nothing to show that the 6,000 gallon steel tanks for gasoline were not portable also. Mr. Egge testified that a 2,250 barrel tank was not "too big a load for a lowboy." Thus a storer and supplier of gasoline would or might for the most part escape the costs of assembling tanks on the island which was the major item with the diesel fuel. The record just does not support the argument because there is nothing to show the cases of diesel fuel and gasoline were enough alike to allow a comparison. Evidently tanker arrivals were crucial in determining the amounts of storage space required for each.

The above statements of fact are based on undisputed evidence in the record when not in the Board's findings. There is little significant conflict of testimony.

We need not linger with the discovery by each side that the other thought it owned the steel welded tanks, the adjudication of the dispute by the contracting officer, and the ASBCA appeal.

■ We now turn to the law. Defendant says "furnish and install" are apt words to pass legal title to the tanks in dispute, offering no ambiguity to be resolved. We do not agree. The contract uses the words "furnish and install" several times. Thus plaintiff was to "furnish and install" certain prefabricated structures, but the words do not operate of themselves to pass title, for defendant had an express option to purchase. Section 3, pars. m and n of the technical Provisions, as amended by Exhibit I. The word "install" alone has no title-passing connotations, for plaintiff was to "install" several items of Government furnished equipment, P. 110–12, as revised by Exhibit K. Plaintiff was to "furnish and install" mooring buoys, some of which were Government furnished. Exhibit K, para. hh. On the whole, we conclude that defendant used the words too loosely for it to be possible to determine what was meant from the mere text of Item No. 43 alone.

The standard is what plaintiff would have understood as a reasonable construction contractor. Hegeman-Harris & Co. v. United States, 194 Ct.Cl. 574, 440 F.2d 1009 (1971). Here the most significant fact, we think, is this: if defendant thought it was buying welded steel tanks, it showed the most extraordinary indifference to the specifications of what it was buying. The contract nowhere prescribed any particular tank capacity. Plaintiff had to figure out what it needed. As already mentioned, after the conferences, but before signature defendant made alterations in the contract which included addition of par. 21–06, previously mentioned, which emphasized defendant's willingness to let plaintiff furnish rubber pillow tanks, but said nothing about welded steel tanks. The conferences, taped and made part of the contract, are replete with discussion of the bolted tank plaintiff then proposed. Defendant's objections, as stated above, were all to its supposed propensity to leak. There is not a word about the cost or value of the tank or tanks defendant, by its present theory, was proposing to buy. Defendant's concern, then manifested, was simply that it should not have to pay for diesel fuel leaked on the ground. On the other hand, if defendant's officials then expected plaintiff to surrender all title to the tanks as installed, they must have found it incredible that plaintiff would furnish other than the cheapest tank which would meet the specifications. The record does not show the cost of the pillow tanks, on board plane in Seattle, (they were flown out) but it does show that installed, they were the cheapest. Further, if plaintiff had been expected to sell defendant welded steel tanks, it is

surprising there was no negotiation of the price. The figure of $139,900 for item No. 43 stood unchanged throughout the negotiations and therefore predated the time when plaintiff gave up on furnishing a bolted steel tank.

The list, SC–48, of contractor installed items to remain Government property, is significant not only because of the omission of the tanks in issue but also as showing the Government knew the loose language of the contract text needed bolstering up as to items it believed it had contracted to buy.

■ The Board to the contrary, there was no difference in the legal status of the pillow tanks plaintiff installed under item No. 43, and the welded steel ones. If defendant owned one, it owned the other. Therefore when defendant acquiesced in plaintiff's removing the pillow tanks, their task once accomplished, this was a significant contemporaneous interpretation of the contract language in which both sides joined. Antecedently considered, however, if defendant thought it was buying welded steel tanks it thought it was buying pillow tanks also. The figure already quoted, of $146,-000, for the welded steel tanks, may represent what defendant thought they were worth, but if so, it allows nothing for the pillow tanks, and plaintiff's argument is unrefuted that the item No. 43 figure of $139,900, if payment for title, is a figure below the cost of the covered items. As plaintiff got the pillow tanks out of Amchitka, defendant of course need not be charged with their value in the quantum proceedings, only their use, but it is entirely wrong to ignore them in attempting to reconstruct the minds of the parties at the times of contract negotiation and signing. This fundamental error vitiates the Board's opinion.

Defendant's attempted comparison in the costs of storing and dispensing diesel fuel and gas failed on the facts, so we need not consider it here in our effort to determine the meaning of the contract. The Board's "inducement" theory failed on the facts also.

■ We conclude that defendant obtained under the contract only use of the welded steel tanks for contract performance, not title. Therefore, defendant's insistence that it owned the tanks was a constructive change order for which plaintiff should receive an equitable adjustment.

Further proceedings on plaintiff's motion and defendant's cross-motion for summary judgment are suspended pursuant to Rule 167 for a period of ninety (90) days, and the case is returned to the ASBCA to afford the parties the opportunity to obtain administrative resolution of the quantum issue, unless it can be settled by negotiation.

DAVIS, Judge (concurring in the result):

There are serious difficulties with each side's case, and no wholly satisfactory decision can be attained. Although as a trier-of-fact I might well agree with the court on the two administrative findings-of-fact it sets aside, I cannot say, as to either, that there is no substantial evidence to support the Board. Behind the determination that plaintiff decided to construct welded steel tanks "as an inducement for the award" is the unequivocal testimony of the contractor's representative (Mr. Egge) that "we wanted to get the contract and we figured that this was an item that might please them if we furnished the welded tanks." I can understand this in no other way than that plaintiff decided upon the welded tanks as an inducement for the award—and as the trier the Board could, if it wished, take the statement at face value. As for the other overturned finding—that the contract price-item of $139,900 adequately compensated plaintiff for the tanks—the government testimony (related in the court's opinion) seems to supply a substantial, though not a good, basis; the Board could decide the point either way on the evidence presented to it.

Nevertheless, I come out for the plaintiff. Accepting the administrative findings-of-fact, we are still left with very

unclear and very ambiguous contract terms, quite susceptible of either plaintiff's or defendant's interpretation. That the contractor supplied the welded tanks as an inducement for the award does not necessarily mean that the Government was to have title; the inducement could have been simply that the receptacles would not leak. Similarly, the rough equivalence between the $139,900 figure and the cost of the tanks loses much significance when it is noted that the same figure was used for the diesel fuel at a time before consideration of welded tanks and when bolted tanks were being proffered. The difficulties with defendant's reading and the reasonableness of plaintiff's (which has its own problems) are spelled out in the court's opinion (though I view as irrelevant some of the detail pointed to by the court). What emerges, still another in a long and melancholy procession, is a very ambiguous government contract in which the contractor could reasonably take the position it did, and in which it is hard to see only one "right" answer. The result was preordained. See, *e. g.*, WPC Enterprises Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); Sturm v. United States, 421 F.2d 723, 190 Ct.Cl. 691 (1970).