**SALEM ENGINEERING AND CON-
STRUCTION CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 345–80C.

United States Claims Court.

July 7, 1983.

David J. Hatem, Boston, Mass., for plaintiff.

Kathleen A. Flynn, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

MAYER, Judge.

Plaintiff Salem Engineering and Construction Corporation (Salem) brought this suit under the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (Supp. IV 1980), for an equitable adjustment of a construction contract price for work performed on instructions of defendant allegedly exceeding the requirements of the contract. The government defended on the basis that Salem's interpretation of the contract is unreasonable and it had a duty to request clarification if the contract specifications and drawings were unclear or ambiguous. Trial was held in Boston, Massachusetts.

## FACTS AND CONTENTIONS

Salem was awarded a contract for the extension and remodeling of the Social Security Administration District Office Building in Haverhill, Massachusetts. In the course of performance, a dispute arose over the scope of roofing work required. When Salem was asked by defendant's Clerk of the Works how it intended to protect the existing occupied building from damage during reroofing, Salem responded that the contract required it to remove and install only so much of the existing roof as was necessary to join it to the roof installed on the new addition. The Clerk replied that under the contract Salem was required to also remove and replace the roof on the existing building. At Salem's request, a written directive to that effect was issued by the General Services Administration (GSA) and, under protest, Salem performed the reroofing work.

After completion of the project, Salem submitted a written claim to GSA on March 5, 1979, with a breakdown of costs for removing and replacing the existing roof and met with GSA representatives to discuss the matter. Three months later, by letter of June 14, 1979, Salem requested a final decision from the contracting officer pursuant to the disputes clause of the contract. Salem's claim for an adjustment was denied and this suit followed.

The disagreement centers around the interpretation of paragraph 2.2 of contract section 0211 on demolition, and general note No. 4 of drawing 27–A–301. Paragraph 2.2 provides:

Remove existing east wall shown to top of foundation walls. Remove all interior partitions as indicated on drawings. Remove exterior grade mounted lighting fixtures. Remove all existing carpet. Remove existing drinking fountain and wheelchair toilet stalls and wall rails. *Remove existing B.U. [built up] Roof, Roof insulation and gravel stop.* (Emphasis added.)

Note No. 4 on the drawing states:

Remove existing B.U. [built up] roof, insulation and gravel stop. Install new tapered urethane insulation, B.U. roof and gravel stop. Add additional blocking and base flashing as required.

Defendant argues that these provisions clearly require Salem to remove and replace the entire existing roof.

Salem, on the other hand, says that when these provisions are read together with the contract drawings and other specifications, and in light of the primary purpose of the contract, construction of an addition to the office building, it is reasonable to interpret them as requiring removal and replacement of the existing roof only to the extent necessary to join it to the roof on the new addition.

As support for this interpretation, Salem points to the following three paragraphs of contract section 01000 on special conditions:

2.1 Existing structures shown shall remain in place except as otherwise noted on drawings and specified under Section [0211], Demolition.

22.1 Unless otherwise noted on drawings or specified, new work in extension of existing conditions shall correspond in all respects with that to which it connects, or to similar existing conditions, in materials, workmanship and finish.

23.1 Existing work shall be cut, drilled[,] altered, removed, or temporarily removed and replaced as necessary for performance of work under the contract. Work that is replaced shall match similar existing work. Structural members shall not be cut or altered, except where noted on drawings, without authorization of the Contracting Officer. Work remaining in place which is damaged or defaced during this contract shall be restored to the condition existing at time of award of contract.

In addition, it cites drawings 27–A–301 and 27–A–303. The principal diagram on drawing 27–A–301 represents an aerial view of the building as it would appear after completion of the addition and contains arrows delineating the existing roof in contrast to the roof on the new structure. It shows the location for a "new" roof scuttle on the "existing" roof, "new" roof drains on the addition, and "new" blacktop and curbing along the side of the building. The north, south, east, and west elevation diagrams on the drawing are shaded to represent the new addition, but not the roof on the existing building. The detail schematic of the gravel stop in the north elevation is shown in the new addition and shows only one layer of insulation as required by the contract for the new roof. In drawing 27–A–303, however, the detail at the air conditioning unit on the existing roof is shown with two layers of insulation, which was the construction of that roof. Salem argues that if it was required to remove and replace the entire existing roof the air conditioning unit detail should show only one layer of insulation as required for the new roof under the contract, just as the one for the gravel stop did.

Defendant counters that paragraph 2 of the general provisions section says that "[i]n case of difference between drawings and specifications, the specifications shall govern," and "[i]n case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing." Defendant further contends that Salem's reliance on the absence of shading on the existing roof in the elevation details of drawing 27–A–301 is mis-

placed because the diagrams do not indicate the scope of the work to be performed. No significance should be attached to the fact that the detail at the gravel stop is shown on the new addition because it is merely an example which could have been shown anywhere on the roof, new or existing, and defendant notes that the steel deck in that detail is labeled "new and existing."

Defendant also points out that the typical duct opening diagram on drawing 27–A–303 contains the phrase, "existing roof deck and structure to remain," along with "(new) 4-ply built-up roofing." These phrases indicate that a new roof was to be placed on the existing structure. Finally, defendant asserts that Salem's interpretation of the contract must be rejected because it gives no meaning to the directive in the specification and drawing note to "[r]emove existing B.U. Roof, insulation and gravel stop."

## CONTRACT INTERPRETATION

■ The initial inquiry is whether the contract specifications and drawings with respect to removal and replacement of the existing roof are ambiguous. The contract is ambiguous if it sustains the interpretations advanced by both parties, *Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 627, 427 F.2d 1233, 1245 (1970), and in construing it, the court must place itself in the shoes of a reasonable and prudent construction contractor. *Norcoast Constructors, Inc. v. United States,* 196 Ct.Cl. 1, 9, 448 F.2d 1400, 1404 (1971); *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The language of the contract must be given that meaning which a reasonably intelligent contractor acquainted with the circumstances surrounding the contract would derive. *Id.; Hol-gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965). Therefore, the court must consider the purpose of the contract along with its language.

■ After examining these specifications and drawings in light of the testimony at trial, the court concludes that the contract can be read to support both parties' interpretations and is, therefore, ambiguous. The court disagrees with defendant's assertion that to find the roofing provisions ambiguous one would have to ignore or give no meaning to the specification and drawing note to "remove existing B.U. Roof, insulation and gravel stop." It is correct that the court should accept an interpretation which gives a reasonable meaning to all parts of a contract, rather than one which renders a provision of the instrument meaningless or useless. *Hol-gar Manufacturing,* 169 Ct.Cl. at 395, 351 F.2d at 979. But Salem's interpretation does not disregard the directives in question; it varies from that of defendant only on the scope of removal required.

The contract does not specifically state that the contractor must remove and replace the "entire roof" on the existing building. Unlike other provisions in the contract, the section on roofing does not contain a description of the scope of work to be performed. *Compare* sections 0952 on acoustical wall panels; 1516 on thermal insulation; and 0990 on painting and finishing, *with* section 0750 on built-up bituminous roofing system. Nevertheless, defendant contends that the work was clearly and unambiguously prescribed by the contract and if it merely had wanted the new roof connected to the existing one, it would have specifically said how to do it. This may have been clear in the minds of the drafters of the contract or defendant's architect, but their subjective intent does not control. The representations of the specifications and drawings govern the interpretation of the contract. *Max Drill,* 192 Ct.Cl. at 628, 427 F.2d at 1245; *L. Rosenman Corp. v. United States,* 182 Ct.Cl. 586, 590, 390 F.2d 711, 714 (1968).

The section on demolition refers to removal of existing roof, insulation and gravel stop, but defendant's own contracting officer testified that a portion of the existing roof would have had to be removed to connect it to the new roof in any event. The scope of work for other items referred to in the demolition section includes qualifying phrases such as "all" or indicates the

number or locations of items to be removed.* No similar qualifying phrases are used for removal of the existing roof.

Salem's interpretation of these words as requiring removal of the existing roof only to the extent necessary to join it to the roof of the new addition was reached after reviewing drawings which indicate installation of a "new" scuttle on the existing roof and "new" roof drains on the addition. Yet they refer to the roof on the existing building as "existing," rather than "new," and contain elevation diagrams that are shaded in those portions representing the new addition, including the new roof, but not the existing roof.

Three of the details on the drawings also support Salem's interpretation. The typical curb detail at the air conditioning unit, which is on the existing roof, shows two layers of insulation, rather than one as required for the new roof. Details on drawing 27–A–302 state, "Alum[inum] gravel stop to match existing." If Salem were to remove the entire existing gravel stop, rather than only the gravel stop on that part of the existing roof adjoining the new one, there would be no gravel stop to match. In addition, while the specifications include detailed provisions to protect the existing building upon demolition of walls joining the new addition, no similar safeguards during removal of the roof of the occupied building are specified.

■ The burden of ambiguity is somewhat shifted to the contractor by a provision calling on it to seek clarification of ambiguities. *See WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 7, 323 F.2d 874, 877 (1963). But the government cannot require a contractor to notify it of every possible ambiguity or potential difference in interpretation. *Max Drill,* 192 Ct.Cl. at 625, 427 F.2d at 1244. To do so would be to make the contractor an insurer against all government mistakes. *See Mountain Home Contractors v. United States,* 192 Ct.Cl. 16,

22, 425 F.2d 1260, 1264 (1970). The most that can be required of a contractor is to notify the government of major discrepancies or errors it detects in the specifications and drawings, or risk an adverse construction. *Id. quoting Blount Bros. Construction Co. v. United States,* 171 Ct.Cl. 478, 496, 346 F.2d 962, 973 (1965). What constitutes a patent or major discrepancy or ambiguity is defined on an *ad hoc* basis. *Max Drill,* 192 Ct.Cl. at 626, 427 F.2d at 1244; *L. Rosenman Corp.,* 182 Ct.Cl. at 590, 390 F.2d at 713.

■ A government contractor need not exercise clairvoyance to determine its contractual responsibilities. *See Corbetta Construction Co. v. United States,* 198 Ct.Cl. 712, 723, 461 F.2d 1330, 1336 (1972). It does not bear the burden of interpreting a contract correctly, only of interpreting it reasonably. *Max Drill,* 192 Ct.Cl. at 627, 427 F.2d at 1245. Accordingly, as drafter of the contract, defendant shoulders the responsibility of seeing that within the zone of reason the words used convey their intended meaning. *See John McShain, Inc. v. United States,* 199 Ct.Cl. 364, 378, 462 F.2d 489, 496 (1972); *Firestone Tire & Rubber Co.,* 195 Ct.Cl. at 30, 444 F.2d at 551. The risk of ambiguity rests on the government. *United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 887, 25 L.Ed.2d 224 (1970); *United Pacific Insurance Co. v. United States,* 204 Ct.Cl. 686, 695, 497 F.2d 1402, 1407 (1974).

If defendant wanted Salem to remove and replace the entire existing roof, it should have said so explicitly. *See L. Rosenman Corp.,* 182 Ct.Cl. at 591, 390 F.2d at 714; *Schweigert, Inc. v. United States,* 181 Ct.Cl. 1184, 1190, 388 F.2d 697, 700 (1967). To merely say, "remove existing roof," when part of the existing roof would have to be removed to join it to the new addition is not adequate to place a contractor on notice to reroof the entire existing building. This is not to say the contract cannot be

---

* When the contract refers to removal of existing walls, it specifies which walls. When it refers to removal of carpet, it specifies "all existing carpet." When it refers to removal of partitions, it requires removal of "all interior partitions as indicated on drawings." In referring to lighting fixtures, it specifies the number of fixtures to be removed.

interpreted as the government does; only that a contractor could reasonably construe it as did Salem without being aware of the government's interpretation. The evidence shows this to have been the case and the court so holds.

This conclusion is buttressed by testimony about Salem's actions manifesting its interpretation of the contract. *See Perry and Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). Salem's president testified that upon learning of the GSA directive to reroof he contacted his roofing subcontractor, whose bid was based on the square footage of only the new addition. The subcontractor had not yet begun work and refused to proceed because his work force did not do demolition and he would not have bid on the project if he had known this was necessary. Salem's president said he then asked two other roofing contractors to bid on the project. One had previously but unsuccessfully bid on the contract and its president, with 25 years' experience in roofing, testified that his earlier quotation was also based on the square footage of only the new addition. He came to his quote after independently studying the contract and drawings and was surprised to learn of the government's contrary interpretation. The other contractor, the one who actually performed the labor, is no longer in business and Salem's attempt to secure a representative to testify was unsuccessful.

An accumulation of mistaken interpretations cannot serve to vary the contract if it is clear. But the reasonableness of an interpretation of an ambiguity is enhanced by evidence that the same interpretation was independently derived by experienced subcontractors who bid on the project. *See generally John McShain, Inc. v. United States,* 199 Ct.Cl. 364, 462 F.2d 489 (1972).

■ Salem's interpretation does not rest on any major discrepancy or patent ambiguity and is within the "zone of reasonableness." *See WPC Enterprises,* 163 Ct.Cl. at 6, 323 F.2d at 876. Therefore, Salem was not required to seek clarification. The order to do the additional roofing work is in

legal effect a change in the contract, *Max Drill,* 192 Ct.Cl. at 629, 427 F.2d at 1246, for which Salem is entitled to the damages it proves.

## DAMAGES

Calculation of the amount of damages to which Salem is entitled is complicated by the general absence of business records to support the elements of its claim. Salem's records for this period were filed as exhibits in an unrelated civil case in the state courts of New Hampshire. Imprudently, it did not retain copies of these documents, and repeated efforts by Salem and its counsel failed to recover them. They are now presumed lost.

Knowing that it had this claim, it is surprising that neither Salem nor its former counsel retained copies of the documents, the best evidence of the costs incurred. On the other hand, and on balance, the court is of the view that it is not unreasonable for one to assume that property entrusted to a court of competent jurisdiction will be secure. The apparent dereliction of the custodians of these records will not be held against Salem.

■ Determination of the amount of an equitable adjustment is not an exact science and mathematical precision is not necessary where legal injury has clearly occurred. *Inland Container, Inc. v. United States,* 206 Ct.Cl. 478, 494, 512 F.2d 1073, 1082 (1975). When plaintiff is prevented from specifically proving its damages for reasons beyond its control, as in this case, a court may use a "jury verdict" to determine the amount of recovery if the evidence is sufficient for a fair and reasonable approximation. *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 649–52, 532 F.2d 739, 742–44 (1976); *W.R.B. Corp. v. United States,* 183 Ct.Cl. 409, 425 (1968); *Western Contracting Corp. v. United States,* 144 Ct.Cl. 318, 334 (1959). Weighing the conflicting claims of the parties, *Meva Corp. v. United States,* 206 Ct.Cl. 203, 221, 511 F.2d 548, 558 (1975), it is therefore necessary to consider wheth-

er Salem's substitute evidence sufficiently establishes its damages.

 Salem seeks $12,918 for labor, materials, overhead, and profit, which represents the difference between the original subcontractor's bid of $12,844 and the final cost of performance, $23,609, plus profit and overhead calculated at 10 percent each. The amount a contractor is allowed to recover as an equitable adjustment is the difference between what it cost the contractor to do the work and what the cost would have been if the change had not been ordered. *Law v. United States,* 195 Ct.Cl. 370, 435 (1971). In appropriate circumstances, this includes profit and overhead for the additional work to put the contractor in as good a position as he would have been in but for the change. *Bennett v. United States,* 178 Ct.Cl. 61, 70, 371 F.2d 859, 864 (1967).

Defendant argues that Salem should not recover all of its labor costs because it has withheld part of the payment to the subcontractor who provided the labor because of faulty workmanship, and that Salem should recover profit and overhead less than the 10 percent maximum allowed by the contract. It concedes only that Salem incurred those material costs for which there is an invoice.

 Salem, on the other hand, asserts that it may recover the amount withheld from the subcontractor for poor workmanship it had to correct because it remains liable to the subcontractor until a release has been signed. It should be allowed to recover overhead and profit of 10 percent just as defendant agreed to for another change order under this contract. In addition, it cites uncontradicted testimony of both Salem's president and a roofing contractor with 25 years of experience who bid on this project that the material costs were reasonable. The roofing contractor also testified that the labor costs were below what he would have charged.

While the evidence presented by Salem on material and labor costs lacks the certainty of business records subject to audit, it is sufficient for the court to reach a fair and reasonable conclusion about their value.

Because Salem remains potentially liable to its subcontractor, the court will also award that amount withheld from the subcontractor for poor workmanship. *See Cross Construction Co. v. United States,* 225 Ct.Cl. 616, 618 (1980). And, in light of the earlier change order awarding profit and overhead calculated at 10 percent, the court finds it is reasonable to award the same here.

Accordingly, judgment will be entered for plaintiff in the amount of $12,918, plus interest from March 5, 1979, computed in accordance with the Contract Disputes Act of 1978, 41 U.S.C. § 611 (Supp. V 1981), and costs.

It is so ORDERED.