**E.H. LADUM**

v.

**The UNITED STATES.**

**No. 281–81C.**

United States Claims Court.

May 7, 1984.

J. William Bennett, Portland, Or., for plaintiff.

Michael A. Gordon, Washington, D.C., with whom were Acting Asst. Attys. Gen. Richard K. Willard, Sandra P. Spooner and Randall B. Weill, Washington, D.C., for defendant.

## OPINION

WOOD, Judge:

In this case, before the court pursuant to Section 10(a)(1) of the Contract Disputes Act, 41 U.S.C. § 609(a)(1) (1982), plaintiff sues to recover damages for breach of a 1979 agreement calling for the lease to defendant of an office building (to be constructed by plaintiff) at Cougar, Washington, for use as a Forest Service Ranger Station.[1]

Plaintiff contends that defendant's purported termination of the agreement in June 1980, shortly after the violent eruption of nearby Mt. St. Helens, amounted to a contractual breach, thereby entitling plaintiff to recover "foreseeable damages" (said to exceed $425,000). Defendant's response is that it was within its contractual rights in terminating the agreement, and that it is not obligated to plaintiff, in any amount.

For the reasons hereinafter appearing, plaintiff is not entitled to recover. The complaint will be dismissed pursuant to RUSCC 58.

### I

On April 23, 1979, defendant, acting through the Forest Service, United States Department of Agriculture, issued Solicitation R6–79–165 (the solicitation), requesting

---

1. As of 1979 and the first half of 1980, plaintiff was one of two principals in a partnership called S & L Properties, a party to the 1979 agreement. The partnership was dissolved July 25, 1980, and plaintiff duly succeeded to all claims against the Forest Service arising out of the agreement. Defendant does not challenge plaintiff's right to prosecute this action. As used herein, the word plaintiff means either Mr. Ladum or the partnership, as is appropriate.

proposals to lease office space to defendant for use as a Ranger Station at Cougar (near Mt. St. Helens), within the St. Helens Ranger District, Gifford Pinchot National Forest, in southwestern Washington. At the time of the issuance of the solicitation, the Forest Service was aware that there were no existing facilities that would satisfy its needs. The Service contemplated that the successful offeror would construct a facility to meet those needs, in conformity with the specifications included as part of the solicitation.

Among other things, the solicitation provided that the successful bidder "shall enter into a formal lease prepared on SF–2, covering the period from the date of occupancy to September 30, 1980," with the "Office to be ready for occupancy on or before January 15, 1980." [2] The solicitation further provided that:

6. RENEWAL OF LEASE:

The Government shall have the right to renew any lease resulting from this bid from year to year until September 30, 1984 with the same terms and conditions as the original lease; *provided* notice be given in writing to the lessor at least 90 calendar days before the lease or any renewal thereof would otherwise expire; *provided that* notice shall be computed from the date of mailing.

7. TERMINATION:

The Government shall have the right to cancel the lease to effect termination at the end of the firm term of the initial lease term, or at any time thereafter, on 90 days prior written notice.

On June 7, 1979, plaintiff timely submitted to the Forest Service a "Proposal to Lease Space." The said proposal reflected full acceptance of each of the terms and conditions stated in the solicitation, and specified an initial term of lease from "Occupancy" (offered on January 1, 1980) to an "Inclusive date" of September 30, 1980. Plaintiff's offer provided that defendant might "terminate at end of firm term on 90 days prior written notice." By letter, dated June 18, 1979, the Forest Service advised plaintiff that its offer to provide space had been accepted, "subject to the limitations of the Economy Act." The requirements of the Economy Act were duly and timely satisfied.

Promptly after receipt of the Forest Service's letter of June 18, 1979, plaintiff began construction of the proposed office building. On September 7, 1979, plaintiff and the Forest Service executed a lease.[3] The initial term was to begin "on occupancy" and extend "through September 30, 1980, subject to termination and renewal rights as may be hereinafter set forth." With respect to termination, the lease stated that:

4. The Government may terminate this lease at any time by giving at least 90 days' notice in writing to the Lessor and no rental shall accrue after the effective date of termination. Said notice shall be computed commencing with the day after the date of mailing.

By September 20, 1979, plaintiff had completed excavation of the main building footings and foundation wall for the proposed facility, and a portion of the footings and foundation wall concrete had been poured. Plaintiff had been unsuccessful in obtaining either a construction loan or permanent financing for the proposed facility, however, and about September 20, 1979, all work at the building site stopped.

In October 1979, the Forest Service requested a schedule showing when plaintiff proposed "to complete various phases of the work in order to meet the deadline of

---

**2.** The solicitation expressly provided that "Rental shall not be paid by the Government until the entire premises or suitable units thereof have been made ready for use and occupancy. * *." There is no contention that any part of the office space here relevant ever became "ready for use and occupancy."

**3.** The basic reason for the lease (executed, at plaintiff's request, prior to completion of construction), was to facilitate plaintiff's efforts to obtain financing for the project. Execution of a lease prior to occupancy was not customary. Indeed, the contracting officer had never done so theretofore.

January 15, 1980 required by the lease contract." In November 1979, plaintiff advised the Forest Service that obtaining satisfactory financing had proved and was proving to be difficult, and that until "both our financing and the delays attributable to winter weather * * * have been overcome," plaintiff could not establish a firm construction schedule.

The proposed facility was not ready for use and occupancy by January 15, 1980. During discussions with the Forest Service throughout the early part of 1980, plaintiff remained optimistic about being able to solve the problem, but in fact never actually succeeded in getting his hands on the money to complete construction of the proposed facility. On April 30, 1980, plaintiff advised the Forest Service that if financing could be obtained, construction on the proposed facility could resume by the end of May 1980, and that that facility could be ready for occupancy by October 1, 1980. The following day, he advised the contracting officer that he expected to be able to obtain financing (and commence construction) later that month, and that:

> It is my personal conviction that we will be able to assure you occupancy of the new St. Helens District Ranger Station by the first week in October.

On May 7, 1980, the contracting officer requested that plaintiff submit a detailed work schedule (including a commencement date prior to May 31, 1980), and a proposed occupancy date "not later than October 1." The contracting officer also stated that should plaintiff either not submit an acceptable schedule by May 31, 1980, or fail to perform in accordance with that schedule, a

termination for default would be considered.[4]

Despite plaintiff's claims to the contrary, the record does not establish that prior to, during, or after May 1980, there was ever any explicit or implied change in, or modification of, the agreement between plaintiff and the Forest Service with respect to either an occupancy date, the initial firm term of the lease, the end of that term, or otherwise.[5]

In the meantime, the forces of nature had begun to have great impact on the area. In March 1980, earthquakes near Mt. St. Helens, and eruptions of steam and ash from the mountain itself, began. Ominous signs of activity continued and, on May 18, 1980, Mt. St. Helens literally exploded.[6] The violent and catastrophic eruptions that occurred resulted in great loss of life, and widespread destruction throughout and beyond the Gifford Pinchot National Forest.

On May 27, 1980, plaintiff asked the Forest Service in substance, whether, in light of recent events, the Service still intended to move the St. Helens Ranger District to Cougar. On May 28, 1980, the contracting officer replied that because of existing uncertainties someone at Gifford Pinchot National Forest Headquarters had indicated to him a desire to "cancel" the agreement with plaintiff, but that he nonetheless wanted to explore the possibilities of extending that agreement before taking any formal action.[7] In a conversation June 5, 1980, plaintiff was informally advised that the Forest Service would probably cancel

---

4. Indeed, the possibility of a default termination had been brought to plaintiff's attention in early March 1980. The contracting officer had concluded, however, that doing so at that time would not be in the best interest of the government.

5. Specifically, the court is unable to agree with plaintiff that the Forest Service's May 7, 1980, letter reflects agreement on an "initial firm term, which commenced October 1, 1980 and would have ended September 30, 1981."

6. In late March 1980, the Forest Service had relocated the Pine Creek Ranger Station, near Mt. St. Helens, to temporary rented space in Cougar. After the May 18, 1980, explosion, the State of Washington and the federal government closed in excess of 600,000 acres (including the town of Cougar) to the public; access to the closed area was by permit only.

7. The construction schedule requested by the contracting officer's letter of May 7, 1980, to plaintiff, had not been (and never was) submitted to the Forest Service.

its agreement with plaintiff.[8] On June 6, 1980, plaintiff replied that "we are acting as if written notice [of termination] had been received so as to mitigate further possible damages * * *." The contracting officer subsequently gave further consideration to the matter, discussed the action to be taken with other Forest Service personnel, and eventually concluded to terminate the agreement.[9]

By letter, dated June 27, 1980, plaintiff was formally notified that:

> In accordance with Clause 7 TERMINA-TION, of Schedule A to Solicitation No. R6–79–165, the Government is hereby providing notice of its intent to terminate this lease at the end of the firm term of the initial lease term which is September 30, 1980.
>
> Since the facility is not completed, the Government has not yet accepted it, and has not taken occupancy of the space. No rent has accrued. No rent shall accrue prior to the effective date of termination. The Government therefore believes it has no financial obligation under the provisions and requirement of the lease agreement.

In October 1980, plaintiff submitted to the contracting officer certified claims for damages, totalling $419,266.54, arising out of the said termination of the agreement. The contracting officer denied the claims in full December 5, 1980. This action followed. Trial, on both liability and damages, has been held. Briefing has been completed, and the case is ready for decision.

## II

The basic inquiry in this case is whether, in purporting to terminate its agreement with plaintiff effective September 30, 1980, defendant breached that agreement. It is concluded that the termination was a valid exercise of an existing right.

■ Both the contract created by the June 1979 offer and acceptance, and the subsequent "lease" contemplated by that contract—executed, at plaintiff's request and for plaintiff's benefit, during construction of the facility to be leased—provided for a firm initial "term" beginning on "occupancy," and ending September 30, 1980. While both parties then intended and expected that occupancy would occur no later than January 15, 1980, their explicit agreement was to an original term expiring September 30, 1980.

The premises defendant hoped to occupy in Cougar never came into being. Instead, substantial delays in construction in 1979 and early 1980, extending even beyond the eruption of Mt. St. Helens on May 18, 1980, occurred. Shortly thereafter, of course, there was both formal written notice of termination pursuant to the termination clause of the contract, effective at the end of the initial firm term provided therein, and a total cessation of any effort toward resumption of construction, albeit perhaps not in that precise order. In any event, however, plaintiff advances no arguments based solely upon a failure of completion of the premises to be leased (or, for that matter, upon the terms of the lease *per se*).

What plaintiff does contend is that in this case plaintiff and defendant agreed, in the first instance, "to engage in a firm term lease of one year effective commencing upon occupancy," and that they subsequently entered into "an agreement [express or implied] that the initial lease term would be from occupancy on October 1, 1980 for one year following thereafter." As plaintiff sees it, the purported termination of the agreement effective September

---

**8.** In plaintiff's words, the notice given was of the "probable, if not actual, cessation * * *" of the agreement.

**9.** On May 29, 1980, because it appeared highly unlikely that a Ranger Station would be located at Cougar in the foreseeable future, and because recent volcanic activity had made it necessary to evacuate the Mt. St. Helens Ranger Station again, the Forest Supervisor, Gifford Pinchot National Forest, had requested that the agreement between plaintiff and the Forest Service be cancelled, and that the lease covering the temporary space used for relocating the Ranger Station in Cougar also be terminated.

30, 1980, was therefore a "repudiation and breach" of contract.[10]

As defendant persuasively urges, the contention that the parties intended an initial firm lease term of a year commencing on the date of occupancy runs directly contrary to the language chosen by the parties to express their mutual undertaking. Accordingly, it must be rejected. *Petrofsky v. United States,* 203 Ct.Cl. 347, 357–58, 488 F.2d 1394, 1400 (1974). To accept this contention would be to rewrite the agreement between the parties, not to interpret it. The parties agreed that the end of the initial firm term of the lease would be September 30, 1980, not some indefinite date thereafter.

Plaintiff's further contention—that there was an express or implied modification of the written agreement between the parties—changing the initial lease term to a one-year period commencing October 1, 1980, and expiring September 30, 1981—is no more persuasive. Nothing in the record supports the notion that the contracting officer somehow modified the terms of that written agreement by establishing "a new date of occupancy of October 1, 1980." If plaintiff believed or intended otherwise, it is of no consequence. The "subjective, unexpressed intentions [or beliefs] of one party" are not binding on the other, in the circumstances here present. *Southern Pacific Transportation Co. v. United States,* 219 Ct.Cl. 540, 548, 596 F.2d 461, 466 (1979).

█ The parties to a contract are always free to modify their undertaking, and an agreement so to modify existing obligations may be implied from the conduct of the parties following the formation of the contract. *Byers Transportation Co. v. Fourth National Bank and Trust Co.,* 333 F.2d 822, 825 (10th Cir.1964). The burden of proving that such a modification has occurred, however, rests upon the party asserting that the original agreement has been altered. *Norcoast Constructors, Inc. v. United States,* 196 Ct.Cl. 1, 6, 448 F.2d 1400, 1402 (1971). Plaintiff's allusions to a governmental failure to terminate for default, to defendant's post-January 15, 1980, interest in the status of construction, and to the government's concomitant hope and expectation (for a time) that "occupancy" could occur within the time frame agreed upon by the parties, fall far short of justifying the conclusion that defendant agreed to a new initial firm term of lease running from October 1, 1980, to September 1981.

But for the eruption of Mt. St. Helens, the original agreement between plaintiff and defendant might well not have been terminated effective September 30, 1980, but might instead have been continued for at least another year, if not longer. That agreement did not, however, provide for any rental payments prior to occupancy, and the right of renewal it conferred on defendant was a unilateral right. By offering to build and lease property on the terms actually agreed to, plaintiff assumed a risk that rental payments during the initial term of the lease would amount to little or nothing, and the even greater risk that defendant might decide not to renew the lease effective September 30, 1980.

In passing, even had construction of the proposed facility been completed on or before January 15, 1980, and had defendant accepted the facility for use and occupancy at that time, the clear terms of the bargain between the parties would have enabled defendant, once Mt. St. Helens erupted as it did in May 1980, to cancel the lease under its termination clause effective September 30, 1980. There is no reason plaintiff should be put in a better position than he would have occupied had his performance been timely simply because he failed to complete construction as scheduled.

**10.** Plaintiff's reference to *De Vito v. United States,* 188 Ct.Cl. 979, 413 F.2d 1147 (1969), and to a governmental waiver of any default by plaintiff, are irrelevant. All else aside, there was no termination for default here. The suggestion that the lease was "not legally within the Contracting Officer's lease authority" because it purported "to be effective from September 7, 1979 to September 30, 1980" is sophistical. Though dated September 7, 1979, the lease was to be "effective" only on occupancy.

Plaintiff has advanced no sound basis for concluding that he is entitled to recover. The complaint is therefore to be dismissed.[11]

---

11. The issue of damages need not be (and has not been) reached.